692 P.2d 991

**STATE of Arizona, Appellee,**

v.

**Paris Hoyt CARRIGER, Appellant.**

No. 4457–3.

Supreme Court of Arizona,
En Banc.

Dec. 6, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Donald H. Bayles, Jr., Flagstaff, and Robert J. Hirsh, Tucson, for appellant.

HAYS, Justice.

Petitioner Paris Carriger was tried by a jury and convicted of first degree murder and robbery on July 25, 1978. Carriger appealed his convictions and sentences to this court, and we affirmed them in *State v. Carriger*, 123 Ariz. 335, 599 P.2d 788 (1979), *cert. denied*, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980) (Carriger I). In 1982 Carriger filed a Rule 32 petition in this court. *See* 17 A.R.S. Arizona Rules of Criminal Procedure, rule 32. We found that trial counsel had been ineffective at sentencing, so we reversed the sentence and remanded the matter to the trial court with instructions to resentence Carriger and to consider any other matters properly raised. *State v. Carriger*, 132 Ariz. 301, 305, 645 P.2d 816, 820 (1982) (Carriger II).

The trial court rejected all of Carriger's Rule 32 claims, and resentenced Carriger to death. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3); Rule 32, *supra;* and A.R.S. § 13–4031.

This case is before us procedurally on two different legal theories. This is a continuation of the first Rule 32 petition and an appeal from resentencing. We will consider the Rule 32 petition, then address the issues arising out of the resentencing.

RULE 32

Before we address the issues presented in the instant case, a review of Rule 32's functions and requirements would be beneficial. The Rule's functions can be understood, in part, by contrasting the Rule with the function of an appeal.

Although both Rule 32 and the right to appeal are legal devices designed to ensure that every defendant is afforded due process of law, each device has its own usefulness and requirements. In Arizona, the appeal is the post-conviction proceeding of primary importance. The right to appeal is guaranteed by our constitution, Ariz. Const. art. 2, § 24, but the Rule 32 procedure is not. The right to appeal is of such importance that after sentencing, the judge must inform the defendant of his right to appeal, see Rule 26.11(a), and "[h]and the defendant" written notice of his rights concerning appellate review, Rule 26.11(c), and how "to exercise them" *Id.* There is no comparable requirement for Rule 32.

Rule 32 is separate and apart from the right to appeal, *see State v. Gause*, 112 Ariz. 296, 541 P.2d 396 (1975), *cert. denied*, 425 U.S. 915, 96 S.Ct. 1515, 47 L.Ed.2d 766 (1976), and it is not designed to afford a second appeal, *see State v. Salazar*, 122 Ariz. 404, 406, 595 P.2d 196, 198 (App. 1979), *vacated on other grounds, State v. Pope*, 130 Ariz. 253, 256, 635 P.2d 846, 849 (1981). It is not intended to unnecessarily delay the renditions of justice or add a third day in court when fewer days are sufficient to do substantial justice. *See State v. Guthrie*, 111 Ariz. 471, 473, 532 P.2d 862, 864 (1975). In all cases, civil or criminal, there must be an end to litigation. *See State v. Scrivner*, 132 Ariz. 52, 643 P.2d 1022 (App.1982).

The type of issues an appellant can raise in an appeal and the number of issues an appellant can raise are not limited by a per se rule. *Cf.* Ariz. Const. art. 2, § 24; A.R.S. § 13–4031; Rule 31.13(c)(1)(iv) (none of which set any limits on appeal). As a long-standing practice, however, this court, like other appellate courts, will not tolerate a party's presentation of claims that have no arguable merit. If meritorious, we will consider a claim even if the claim ultimately does not constitute reversible error. The type of issues a petitioner may raise in a Rule 32 petition are limited by court rule. *See* Rule 32.1.

This indicates that the appeal is the preferred method for presenting claims of reversible error. This preference is based on the important consideration of judicial economy and other valid, practical considerations.

If a defendant raises all arguable claims in the first appeal, the appellate court will be better able to make a determination as to whether the defendant has had a fair trial. Once decided, the court's docket will not be filled with repetitious actions. *See*

*State v. McFord*, 132 Ariz. 132, 644 P.2d 286 (App.1982) (seventh Rule 32 petition dismissed). Because the appeal is so important, the courts are charged with informing the defendant of his appellate rights. Thus, our rules are designed to facilitate prompt, full, appellate consideration.

Also, appeals must be filed shortly after conviction; Rule 32 petitions are often filed, as in this case, years after the trial. When the appeal is filed, the witnesses' memories and evidence are fresh and readily available should a new trial be required. When a Rule 32 petition is filed, the witnesses' testimony may be lost because of dimmed memories or death and physical evidence may be lost, destroyed, or misplaced.

■ In summation, appeal is designed to give prompt, full appellate review to those who have grounds to believe they have not had a fair trial. Important policy considerations require that all claims be raised in the appeal. Rule 32 "is designed to accommodate the unusual situation where justice ran its course and yet went awry." *Id.* at 133, 644 P.2d at 287. Rule 32 is a safeguard in addition to the many others that are part of our system, but it may not be abused.

■ Petitioners must strictly comply with Rule 32 or be denied relief. *Gause, supra.* Failure to comply with Rule 32 procedure will result in a finding that petitioner waived his right to present a Rule 32 petition. *See State v. Herrera*, 121 Ariz. 12, 588 P.2d 305 (1978), *cert. denied*, 441 U.S. 949, 99 S.Ct. 2175, 60 L.Ed.2d 1054 (1979). It is the petitioner's burden to assert grounds that bring him within the provisions of the Rule in order to obtain relief. *See Salazar, supra.* Carriger has not met his burden.

Rule 32.2(c) provides in pertinent part that "[t]he court may infer from the petitioner's failure ... to raise an issue on appeal after being advised by the sentencing judge of the necessity that he do so ... that he knowingly, voluntarily and intentionally relinquished the right to do so." Subsection (d) indicates that the inference shall be considered part of the evidence.

More than 3½ years after conviction, and 2½ years after we affirmed his conviction, Carriger filed this petition. The state pleaded the issue of preclusion, *see* Rule 32.2(d), but presented no evidence in support at the Rule 32 hearing. Carriger claims that he is, therefore, not barred from raising claims not raised in *Carriger I.* We disagree.

■ The state may choose to present evidence of preclusion before or after a petitioner has presented evidence to overcome the inference, but a petitioner is barred from presenting a Rule 32 petition unless he overcomes the inference of Rule 32.2(c). To support a finding of waiver under subsection (c), the record must indicate that petitioner was aware of the necessity of raising in his appeal the claim he now presents and that he knowingly, voluntarily and intentionally waived his right to present his claim.

■ In his Rule 32 petition, Carriger points out what he claims are several instances of incompetent representation. We find that Carriger was aware of the necessity of raising competency of counsel issues on appeal. On September 6, 1978, he filed a handwritten motion for new counsel for purposes of appeal. In the motion, he alleged that Thurman Gay, chief defense attorney, was incompetent, based on Gay's failure to conduct a proper pretrial investigation, among other allegations. Carriger told the trial judge after sentencing that he wanted new counsel because of the claims he wanted to raise, and the inconsistency of retaining Gay to raise those claims. The trial judge responded that Carriger was correct to bring that issue to the court when he did. The court granted the motion and, as Carriger requested, appointed a different attorney. We find that Carriger was sufficiently informed of the necessity of raising competency of counsel issues on appeal.

Carriger worked extensively preparing for his trial. The record contains cogent suggestions from Carriger to counsel concerning whom counsel should subpoena, what questions he wanted counsel to ask him while he was on the stand, and what items should be argued to the jury. Carriger reviewed the deposition of the state's key witness and pointed out the inconsistencies between it and the police reports. Carriger urged counsel to present as much evidence as possible because "sheer weight of numbers can sometimes do what the evidence can't. And the more there is, the better at reversible error." Carriger also requested counsel to visit him more often and investigate items Carriger brought to counsel's attention. In addition, Carriger indicated that he had "defended inmates for years in prison disciplinary" proceedings, and was active in civil rights litigation.

Carriger's appellate counsel, Christy Wotruba, testified at the Rule 32 hearing. She said that she was appellate counsel for eight months and that during that time she had a "rather lengthy interview" with Carriger and an "extensive correspondence[,] ... telephone calls and a great deal of contact with him." She had much more contact with Carriger than she had with her average client. She often received "letters of assistance, instruction, and direction" from Carriger. She called him "a self-styled jailhouse lawyer and a very good one at that, and he was to provide me with cases and citations and things that I should look up." Before the Rule 32 hearing, Carriger's present counsel wrote Wotruba to determine whether she had raised all possible claims in the first appeal, to which she replied: "I believe I raised all arguable issues ...." At the Rule 32 hearing, Carriger testified he was satisfied with Wotruba's efforts on his behalf.

Moreover, he filed a *pro se* brief on appeal raising several issues. In that brief, Carriger did not allege most of the claims he now urges as reversible error. This brief was in addition to the two briefs filed by his attorney.

This evidence leads us to conclude that Carriger was and is familiar with the legal process. With his extensive participation in the preparation of the appeal, we think, based on this record, the fact the issues he seeks to raise now were not raised on appeal indicates a knowing, voluntary and intentional decision to relinquish his right to claim these issues as error. As in *Scrivner, supra*, petitioner intentionally sought substitute appellate counsel in order to raise claims of ineffective assistance of counsel. In his Rule 32 petition, Scrivner sought to raise additional claims of ineffective assistance of counsel. The court of appeals said: "Petitioner did not urge these grounds at the time of his appeal, nor in the exercise of his judgment did appellate counsel see fit to do so." *Id.* 132 Ariz. at 54, 643 P.2d at 1024. Because petitioner merely sought to "raise new grounds to support a previously considered claim," *id.*, the relief Scrivner sought was denied. As we explain below, almost all the claims Carriger seeks to raise now are based on the record developed in 1978, or known to Carriger at that time.

We hold there is more than adequate evidence in the record to support the inference of Rule 32.2(c), and no evidence was presented to overcome it. Because Carriger has not complied with Rule 32.2(c), he would not be entitled to obtain relief under state law (except for one issue discussed, *infra*).

■ We find only one claim is properly presented under state law in this Rule 32 petition, and we address the merits of that claim. *See* Rule 32.1(g). Carriger alleges that *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), decided after Carriger's conviction was affirmed, mandates reversal of his sentence. *Beck* holds that if there is support in the record for a finding of guilt on a lesser included offense, the court must instruct on the lesser included offense. Carriger claims the lesser included offense of second degree murder is supported in the record and the jury should have been instructed on it. We disagree.

We must review this claim under the former homicide statutes. *See State v. Coconino County Superior Court,* 139 Ariz. 422, 678 P.2d 1386 (1984). Under former A.R.S. § 13–452, first degree murder could be committed in several ways, two of which are relevant in this case: the murder was "wilful, deliberate and premeditated," *id.,* and the murder occurred during the course of a robbery. *Id.*

We define wilful, deliberate and premeditated as their ordinary meanings: wilful means an act is done intentionally, deliberate means careful consideration of one's choices, premeditated means to think about beforehand. The elements may be shown by the use of circumstantial evidence, *see State v. Pittman,* 118 Ariz. 71, 75, 574 P.2d 1290, 1294 (1978), "and all reasonable inferences will be resolved against the defendant." *Id.*

In this case, the victim was bound before the attacks began. Thus, the reasonable inference is that Carriger's action was deliberate and premeditated. Carriger used three different forms of attack upon the victim: two were used to cause mortal wounds to the head; the other was used to deprive the victim of life sustaining air. This shows the acts were wilfully calculated to cause death. We hold these facts tend to prove only first degree murder and not second degree murder. *See Pittman, supra; cf. State v. Lacquey,* 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977) (the "random, violent and indiscriminate attack upon the victim, rather than the deliberate infliction of injuries calculated to result in death ...." could support a verdict of second degree murder but not first degree.).

Former A.R.S. § 13–452 defined felony murder as first degree murder. There is no lesser included offense of felony murder. *State v. Arias,* 131 Ariz. 441, 641 P.2d 1285 (1982). Thus, in the instant case, the facts would not support a finding of second degree murder, and it was not error to not give an instruction on second degree murder.

In *Beck v. Alabama, supra,* the United States Supreme Court said there is a constitutional difference between the death penalty and all other sentences. *Id.* 447 U.S. at 637–38, 100 S.Ct. at 2389–90, 65 L.Ed.2d at 403. Therefore, although we find Carriger's claims would be barred under state law, we address the merits of his claims that we have not considered before.

In Arizona, whether a lawyer displayed minimal competence at trial is determined by using the standard we adopted in *State v. Watson,* 134 Ariz. 1, 653 P.2d 351 (1982). If counsel does not measure up to the *Watson* standard, defendant must show there is a reasonable probability that, if counsel had not erred, the verdict would have been different. *See State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984) (adopting the test for prejudice set out in *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We note that "the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment." *Strickland, supra,* at —, 104 S.Ct. at 2070, 80 L.Ed.2d at 700. Rule 32 is a collateral attack upon the judgment.

In *Strickland, supra,* the Court also said that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at —, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...." *Id.* at —, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 694. And, "[a]n error by counsel, even if professionally unreasonable does not warrant setting aside the judgment ... if the error had no effect on the judgment." *Id.* at —, 104 S.Ct. at 2067, 80 L.Ed.2d at 696.

The sixth amendment guarantee of right to counsel exists "in order to protect the fundamental right to a fair trial." *Id.* at —, 104 S.Ct. at 2063, 80 L.Ed.2d at 691. A fair trial is defined as "one in

which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id.* at ——, 104 S.Ct. at 2063, 80 L.Ed.2d at 692. A fair trial is meant to ensure that the "result is reliable." *Id.* at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

■ When a defendant raises a competency of counsel claim, the focus is not whether counsel erred, the focus is whether defendant has had a fair trial. "The benchmark for judging any claim of ineffectiveness," is whether the adversarial process was so undermined by counsel's conduct "that the trial cannot be relied on as having produced a just result." *Id.* at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93.

## FACTS

The evidence presented in the trial indicates that Robert Dunbar and Paris Carriger met while in prison and became friends. Dunbar was released from prison sometime before Carriger, who was released a few months before the crimes were committed. A few days before the alleged offenses occurred, Dunbar attempted to burglarize a commercial property. A day before the offenses, Carriger parked his van next to Dunbar's house, intending to live there in his van.

The robbery and murder took place on March 13, 1978. On that morning, Carriger called his employer and told him he was too sick to work. Carriger and Dunbar then spent the morning and part of the afternoon shopping. One of their purchases was a gun.

Dunbar purchased it with money received from Carriger. Dunbar was on parole and purchasing the weapon was a violation of the parole. Dunbar also lied on the federal handgun form.

The two men then went to the victim's jewelry shop. Dunbar had the crystal of his watch polished. While leaving, Carriger said that the store would be an easy place to "hit."

About three o'clock in the afternoon the men separated. Dunbar went to sleep and was awakened by Carriger at about six o'clock. Carriger then told Dunbar about the robbery and murder. The two men left Dunbar's house and went to a "massage parlor." Dunbar tried to sell some of the jewelry there. The men then went to a shopping mall where Dunbar tried to sell the jewelry, and Carriger bought a new pair of shoes. Later that night, the men drove around parts of Phoenix discarding Carriger's clothes and some items taken in the robbery.

The next morning Dunbar called the police and told them he could solve the murder, for which at that point the police had no clues. He asked for immunity for his attempted burglary of a few days before and asked that his parole not be revoked for buying the gun.

The police met Dunbar and listened to his story. They believed him. Later that day Carriger was arrested. The jewels in Dunbar's possession were turned over to the police.

Carriger claims that Dunbar committed the crime. He claims that Dunbar's statement, that he was asleep when the crime was committed, is untrue.

## PRETRIAL CLAIMS

■ Carriger alleges that Gay, his trial attorney, conducted an inadequate pretrial investigation. Carriger argues that a proper pretrial investigation would have revealed several witnesses willing to testify that Dunbar was a liar in general and others who would have testified to bolster Carriger's version of the events.

Carriger claims that Gay should have called the following people, who would have testified concerning Dunbar's reputation for truth: Jackie McCullar, Dale Brandfas, Robert Zorn, Winifred Gaylor, and Frank Terry. We do not think any of the testimony Carriger claims should have been produced would have changed the result.

Jackie McCullar, who is Dunbar's stepdaughter, testified at trial and at the Rule

32 hearing. At trial, she testified that Dunbar and Carriger drove to her house and Carriger, who was the passenger, exited the vehicle and walked up to her porch. He handed her a case that was locked. Later, it was found to contain the stolen jewels. This testimony corroborated Dunbar's version of this event. At the Rule 32 hearing, she was asked if Dunbar was a liar. She testified that he was a pathological liar, and she was afraid of him. She also testified that her testimony at trial was truthful. Thus, she attacks Dunbar's credibility but corroborates his testimony.

Winifred Gaylor, who is Dunbar's mother-in-law, testified at the Rule 32 hearing but not at trial. She testified that Dunbar is a liar. But she also testified that Joyce Dunbar, who is Dunbar's wife and who testified that Dunbar was asleep until 6 o'clock, and Jackie McCullar were truthful. Thus, Gaylor attacks Dunbar's credibility but bolsters the credibility of two people who corroborate Dunbar's testimony.

Gaylor also testified that Dunbar had told her that he "would never commit a robbery where there was a witness." Carriger claims it was important to put this evidence before the jury. We disagree. First, Gaylor testified in 1982 at the Rule 32 hearing, and the trial was in 1978. She did not indicate whether this statement was made before or after trial. Second, Carriger's interpretation of the statement is not the most logical one. He interprets the statement as indicating that Dunbar would kill to cover up a burglary. We think the language is more easily construed to mean that Dunbar would not commit a crime if a witness was present.

Dale Brandfas, a prison official, testified at the Rule 32 hearing but not at the trial. He testified that Dunbar did whatever was to Dunbar's advantage. If that meant telling the truth, Dunbar would do it. He also testified that Dunbar's reputation for truth and veracity was bad and Dunbar was a liar. Finally, the witness testified that Dunbar was as dishonest as any inmate, but Dunbar was no worse than other inmates.

Robert Zorn, a prison official, testified that Dunbar, like 99% of the prison population, was dishonest but that Dunbar stood out from the other inmates as being untruthful. Zorn also testified that once released from prison, and the concomitant peer-group pressure of fellow inmates, the pressure exerted on inmates to be untruthful is removed.

Frank Terry, a prison official, testified at the Rule 32 hearing but not at the trial. He testified Dunbar's reputation for truthfulness in prison was bad, but he cannot remember if he ever met Dunbar.

None of these witnesses would have dissuaded the jury from believing Dunbar's testimony. McCullar calls Dunbar a liar but corroborates his story. Gaylor calls Dunbar a liar but also testified that Joyce Dunbar and McCullar are honest. Thus, these two witnesses tend to indicate that at trial Dunbar testified truthfully.

Brandfas's and Terry's testimony add nothing either. The jury knew Dunbar was a felon, see Carriger I, had recently violated his parole by buying a gun and lying on the gun purchase form, and that he had immunity for a recent attempted burglary. The jury knew Dunbar was an unsavory character.

Zorn's testimony possibly could have added something to Carriger's case but probably not much. Zorn said that Dunbar was more dishonest than the average inmate; however, he also said that once inmates leave prison, they do not have the same great pressures forced upon them that result in untruthful statements. Thus, even Zorn's testimony is consistent with the facts presented at trial and the result. Not having this evidence presented to the jury did not prejudice Carriger. Strickland, supra.

Carriger wrote a note to Gay before trial telling Gay to obtain Dunbar's prison file. Gay did not obtain it. Carriger now claims crucial evidence could have been located in the file if it had been obtained. He argues that Dunbar could have been impeached with the information contained in the file.

The information in the file would have proved, Carriger claims, that Dunbar had a history of committing crimes and then blaming a third party.

The file contains proof, Carriger alleges, that Dunbar burglarized a business building in 1976. Carriger alleges that Dunbar committed a burglary, then flagged down a police officer. Dunbar said he knew who committed the crime, a hitchhiker. The police officer questioned his story and Dunbar confessed to the burglary. He then cooperated with police.

Dunbar also burglarized another business building and took $12,000. Soon after the crime he bought a new car with almost $5,000 in cash. When questioned by the police, Dunbar said he found a sack of money and an attorney told him he could legally keep it. The police refused to believe this story and Dunbar became nervous, began to shake, and asked, "How about a deal?"

If these incidents had been presented in court, we think they would have bolstered the state's case. Both of these incidents reveal an unsophisticated attempt to shift the blame to a nonexistent third party that was quickly dismissed as ridiculous. Moreover, in the second incident, Dunbar physically reacted when his story was questioned.

Assuming, as Carriger alleges, that Dunbar committed this murder, the cover-up is far more elaborate than his previous explanations. Nothing presented to this court indicates Dunbar has the ability to conceive such a story and maintain it under questioning. Dunbar's version of the murder has convinced the police, the prosecutor, the judge, and the jury, all of whom knew Dunbar was a felon. Presenting this information to the jury would have, we think, increased the probability that the jury would believe that Dunbar was, this time, telling the truth. Not obtaining this testimony was, if error, harmless error. *Id.*

Carriger claims two prisoners should have testified to events that would again show Dunbar's history of blaming an innocent third party. Whether these inmates would have been discovered through Dunbar's prison file is unclear, but we shall assume so for purposes of appeal. We note that testimony of prisoners concerning prison events probably is scrutinized more carefully by a jury than their testimony concerning other events, for the reason that Zorn testified: men in prison have pressures exerted upon them to lie.

One inmate testified at the Rule 32 hearing that Dunbar took money from inmates and told the inmates that the witness would give them a weapon. When the inmates asked the witness for the weapon, he did not know what they wanted. The inmates soon realized that Dunbar had taken the money and tried to shift the burden of producing the merchandise to an unsuspecting third party. The inmates demanded and received their money back from Dunbar. Another witness testified to a similar story, only the merchandise was drugs. The result was the same. Again, these incidents tend to help the state's case. These two incidents tend to show that when Dunbar lies, it is quickly seen through. Not obtaining the testimony of these witnesses was harmless. *Id.*

Carriger argues other information contained in the file would have directly refuted parts of Dunbar's testimony. At trial, Dunbar testified that he was not a robber (*i.e.* he would not use force or threat of force to obtain property). Carriger claims evidence in the file directly refutes Dunbar's assertion. Carriger says:

> According to the pre-sentence report in Cause 54079, Dunbar responded to a 1968 polygraph test by admitting:
>
>> He said that about two and a half to three years ago, he was not sure, he, and apparently two others, committed armed robbery in Phoenix and in California.

This statement contains multiple hearsay and to be admissible each aspect of the hearsay must fall under an exclusion or an exception. 17 A.R.S. Rules of Evidence, rule 805. We assume that the prison file and the presentence report would not, with-

out more, make the statement inadmissible. *See id.* rule 1005.

We note that in its present form the statement is probably inadmissible. In *State v. Emery*, 131 Ariz. 493, 504, 642 P.2d 838, 849 (1982), we said that our rule 613 (allowing impeachment of a witness with a prior inconsistent statement) is identical with the federal rule. We also suggested that federal case law is therefore instructive in construing our rule. *See Emery, supra.* Federal courts require the proponent of the evidence to lay a foundation sufficient to show the statement sought to be used is actually attributable to the witness. *Cf. United States v. Williams*, 668 F.2d 1064, 1067 (9th Cir.1981) (sufficient proof to believe witness made the inconsistent statement); *see also Dickinson Supply, Inc. v. Montana-Dakota Utilities Co.*, 423 F.2d 106, 109 (8th Cir. 1970) (proponent must prove witness actually made the statement). We have implicitly approved this requirement. *See State v. Acree*, 121 Ariz. 94, 97, 588 P.2d 837, 839 (1978).

The statement appears to have been written by the presentence investigator who obtained the information from the polygraph operator. No one has advanced any facts to show that the investigator could testify as to the veracity of the statement. Thus, before this statement would be admissible, the polygraph operator would be required to testify. No evidence was presented at the Rule 32 hearing that indicated whether the polygraph operator could testify that Dunbar made the statement, and finally, we have no way of knowing who the polygraph operator was. There are other evidentiary problems. First, the statement was made during a polygraph test. Should that fact be admitted? If so, to complete the story, should the results of the polygraph exam be admitted? Also, the trial took place in 1978, the statement was allegedly made in 1968. Would the statement have been inadmissible at trial for that reason? *See* Rule 403; *see also* Rule 609(b) (even evidence of *conviction* is presumed inadmissible after ten years). Thus, for various reasons, the ad-

mission into evidence of the statement is improbable today, and would have been doubtful in 1978.

Even so, we will assume, for purposes of this argument, that the statement should have been discovered by trial counsel and admitted to impeach Dunbar. If it had been admitted, we do not think the result would have been different. The jury already knew, as outlined above, that Dunbar was an unsavory character. Thus, there was ample evidence presented at trial from which the jury could conclude that Dunbar was not to be believed, yet they believed him. Implicit in the jury's verdict is the jury's conclusion that there is enough corroborating evidence in the case to believe Dunbar was telling the truth at trial. (The same analysis and conclusion is applicable to Dunbar's admission that he carried a gun in a pre-1968 burglary.) Also, the jury heard the uncontradicted testimony of Jackie McCullar (who at the time of the crime had been dating Carriger) which connected Carriger with the stolen property. They also knew that Carriger's fingerprint was found on the tape binding the victim's hands.

Carriger also argues that Dunbar's statement that he "couldn't understand murders" would have been directly refuted by evidence that Dunbar threatened to kill his parents with a steak knife, and had been admitted to the Arizona State Hospital. Again, whether this evidence would have been admissible is questionable. The incident with his parents took place in 1962, or 16 years before trial. With the passage of more than one and one-half decades, was this evidence relevant? Each of such hospital admissions was more than 10 years old at the time of trial. Again, proving these events at trial 16 years later might have been impossible. Also, if the evidence had been admitted, would the state have been entitled to rehabilitate Dunbar's testimony by calling the examining physician, whose statement is contained in the prison file, who stated that Dunbar is violent only toward his father?

In sum, if Gay had obtained Dunbar's prison file, it is doubtful it would have altered the result. We also note that the Arizona case holding that an accused can obtain the prison file of a witness was decided three years *after* Carriger's conviction. *See State v. Morales,* 129 Ariz. 283, 630 P.2d 1015 (1981). Finally, as our discussion points out, Carriger has not shown, even after a full and fair Rule 32 hearing, that the information contained in the prison file is admissible. It is a petitioner's burden to *prove* a constitutional defect, *see* Rule 32.8(c), and not simply allege the existence of facts that possibly could have been admissible at trial. Failure to obtain Dunbar's prison file has not been shown to have prejudiced Carriger. *See Strickland, supra.*

Carriger also claims he was prejudiced because Gay did not effectively interview witnesses before trial. He does not indicate how Gay's conduct of the trial suffered as a result. In carefully reviewing the trial record, we conclude that Gay's examination of the witnesses on the stand does not fall below the *Watson* standard. Therefore, we conclude that, assuming Gay did not adequately interview prospective witnesses, Carriger was not thereby prejudiced.

Carriger argues that a proper pretrial investigation would have disclosed additional witnesses to support Carriger's case. Carriger claims a "fat girl [who] works at [the] U-Totem [at Seventh Avenue and Dunlap] was told by [Dunbar] on March 13 around midnight that I had saved his life twice which was why he was giving me money in front of her .... She can also swear to my presence from 5:00 to 5:15 p.m. on March 13, 1978." Whether the testimony of this person could possibly have affected the verdict is speculative at best. We do not know how much money was exchanged. Thus, the inference that Dunbar was passing the booty to Carriger is weak. Also, if Carriger was at the store at 5:15 p.m. on the day of the crime, this places him near the scene of the crime and close to the time of the crime.

In the evening on the day of the crime, Dunbar and Carriger went to a "massage parlor." While there, Carriger told his prostitute that he felt like he was being "set up." Carriger now argues that this woman should have been contacted by Gay and allowed to testify. Frankly, we do not comprehend how Carriger's self-serving statement through the testimony of this prostitute could have altered the verdict. Not obtaining the testimony of these individuals has not been shown to be prejudicial. *Id.*

Carriger alleges that Gay did not adequately explore the possibility that Dunbar, after Carriger's arrest, placed the key to the locked jewel box in Carriger's jail storage locker. This issue is without merit. The issues concerning the keys were dealt with at trial and on appeal. *See Carriger I.*

Carriger argues that Gay did not contact him often enough during the pretrial stage of the case. After reviewing the record we think Gay knew his case. As the trial court said, it is not the quantity of time accused and counsel spend with each other that is important, it is the quality. *See State v. Hein,* 138 Ariz. 360, 674 P.2d 1358 (1983). We find no prejudice.

Carriger's final claim of pretrial ineffectiveness is that Gay did not consider the possibility that the death penalty would be involved in this case. Gay admitted he did not consider the possible punishment in this case during his pretrial investigation. He also testified he took the charge of first-degree murder very seriously and that his approach was to deal with the guilt phase of the trial first, then deal with the sentencing phase. We do not find that Carriger was prejudiced at the guilt stage by Gay's approach.

### CLAIMS OF INEFFECTIVENESS AT TRIAL

■ Carriger claims that Gay was ineffective because he asked no questions on *voir dire.* Carriger claims a question concerning the jury's view of prisoners "might have been desirable." We hold that Gay's failure to request such a question was not

ineffective assistance of counsel. *See Watson, supra.*

Carriger argues that Gay was ineffective because he did not object to the introduction of five gruesome photographs in this case. We agree. *Id.* We find though that he was not prejudiced. *See Strickland, supra.* We note that raising the issue of photographs on appeal is almost a matter of routine, yet Carriger's first appellate counsel did not raise this issue on appeal. Certainly the photographs were of record at that time and Gay's lack of objection to them could have been discoverable from the record. In any event, we will address the merits of this claim.

We note that if the photographs had been objected to by Gay, the trial court could have admitted the photographs to corroborate Dunbar's testimony. *See State v. Summerlin,* 138 Ariz. 426, 433, 675 P.2d 686, 693 (1983). Because the trial court did not make this finding (with no objection to the photographs there was no need for such a finding), we will assume for purposes of this argument that there was no probative value to the photographs.

We do not think the photographs contributed to the verdict. *See State v. Thomas,* 130 Ariz. 432, 436, 636 P.2d 1214, 1218 (1981). The jury heard Dunbar's testimony and the testimony of Jackie McCullar and the jury knew Carriger's fingerprint was found on the tape that bound the victim's hands. This evidence, not the photographs, is what convinced the jury to convict. We find no prejudice.

Carriger alleges that Gay was ineffective because he allowed a police report to be admitted into evidence. A police report was admitted into evidence, but Gay could *no longer remember why* he allowed its admission into evidence, although Carriger's present counsel represents to this court that the report contains an inconsistent statement of Dunbar's. We conclude that the admission of the report was part of defense trial tactics and will not support a claim of ineffective assistance of counsel. *See Watson, supra.*

Carriger argues that evidence of Dunbar's bad financial situation was not presented to the jury, nor was Carriger's good financial situation presented to the jury. This evidence, Carriger claims, would have established Dunbar's motive and Carriger's lack of motive and he concludes Gay's failure to present this information constitutes ineffective assistance of counsel.

Dunbar's financial condition was presented to the jury as follows:

Q Mr. Dunbar, what is your financial picture?

A I am broke. I am in debt.

Q Have you ever declared bankruptcy?

A I declared bankruptcy in January

. . . .

Gay then asked about "other outstanding debts" that Dunbar was concerned about. The jury knew Dunbar's finances were bad. Also, if Carriger's financial condition had been thoroughly presented, the jury would have been told that Carriger had been working less than three months (he had just been released from prison) and "had no leeway" financially. This evidence would not have helped Carriger. We find no prejudice.

Carriger argues that a crucial witness, Joyce Dunbar, was not properly impeached. Her testimony was that Dunbar was asleep until 6:00 p.m., or until after the crime had been committed. Carriger claims that she had earlier said Dunbar woke up at 5:30 p.m., which would have made it possible for him to commit the crime.

Gay did bring the discrepancies to the attention of the jury as follows:

Q Do you recall telling [my investigator] that prior to your going to bed that afternoon, that you told Dennis to be sure to wake his dad up at 5:30?

A I reminded Dennis.

Q Did you hear Mr. Dunbar tell Dennis?

A Yes, I did.

Q And did I hear you on direct testimony that you said that Dennis did wake him up at 5:30?

**A** I thought it was Dennis but my husband said it was—Dennis and my husband both told me it was Paris who woke him up.

**Q** You told the police it was Dennis, didn't you?

**A** I thought it was Dennis. I wasn't fully awake at the time.

and later:

Let's go back to this waking up bit. Did Dennis not wake up his dad?

**A** No. He said he started to go in to wake him up and that Paris said that he would do it.

**Q** And this was at 5:30?

**A** 5:30, 6:00 o'clock, somewhere around there.

**Q** Now, you told the police that Dennis came in, actually woke him up at 5:30, did you not?

**A** I said I thought he did. I couldn't be real definite because I wasn't fully awake.

Gay's cross-examination of Joyce Dunbar was not ineffective. *Id.*

Gay presented Joyce Dunbar's inconsistencies to the jury through the testimony of a police officer. A detective, on cross-examination, said that he recalled Joyce Dunbar telling him that Dunbar awoke at 5:30 p.m. Finally, Gay reminded the jury of these inconsistencies during final arguments.

The victim in this case had his hands bound with tape. On the tape was a fingerprint belonging to Carriger. Carriger alleges as another aspect of incompetence that Gay did not effectively argue this fact away. Carriger now claims Dunbar took the tape from Carriger's van and the print was already on the tape when Dunbar took the tape. This can only be characterized as a weak assertion and, at best, is not very

credible. Not advancing this argument does not indicate Gay was incompetent. *Id.*

Carriger was advised by Gay not to testify even though Gay said previously, on the record, that Carriger would be testifying. At the Rule 32 hearing Gay said he told Carriger not to testify because he would automatically be impeached with a felony conviction and he, in other respects, would not come across well to the jury. Carriger testified that Gay told him not to testify because the trial court had "committed reversible error." Carriger testified that Gay advised him to "save your version for the retrial." A convicted felon cannot automatically be impeached with a prior conviction. The trial court must use its discretion in allowing the use of prior convictions to impeach a witness. However, in view of Carriger's recent release from prison, there is little doubt that the prior conviction would have been allowed in evidence. *See* Rules of Evidence, rule 609(b). Gay's assessment of Carriger's effect on the jury and the probability of the prior coming to the jury's attention were purely matters of strategy. We find no error and further find no prejudice to Carriger.

At the Rule 32 hearing, Carriger testified that his memory had dimmed during the four years since the trial and that one should not believe him any more than one would believe Dunbar.[1] On the morning of the crime, Carriger testified, he called his employer and indicated he was too sick to work. Carriger wore blue jeans and "house shoes." Dunbar drove Carriger to various stores that day. At one store they looked at and purchased a gun. Later, they went to the jewelry store where the crime would later take place. Carriger's own testimony places him in the jewelry

---

1. "You see, I'm not suggesting that you should believe me over Dunbar. Quite frankly, we have two convicts and anyone who believes a convict, for any purpose, unless there is some other evidence to back it up, is being foolish. I try to tell the truth. It is my major stock and [sic] trade. It is the one point that allows me to interact with both convict and guard with a reasonable safety.

"But, by that same token, anyone who takes it for granted that I'm going to tell the truth, whenever my life is concerned, without even looking at the evidence, is being a little foolish. But, I say, you should run back and look at the evidence. Don't just talk to me and don't just talk to Dunbar; go with the evidence."

shop hours before the crime. He also testified he knew when the store closed. All of this corroborates Dunbar's testimony.

Carriger then testified that at 3:00 p.m. on the day of the crime, he left Dunbar and went to a restaurant. He then went to an adult bookstore. From there he returned to Dunbar's house. This was at five o'clock. Carriger, without anyone at Dunbar's house seeing him, walked to a convenience store "two short blocks" from Dunbar's house.

He returned from the convenience store a little before six o'clock. He was sitting in his van when Dunbar came to the van a few minutes after six. Dunbar, based on Carriger's "prison-smarts," looked like he had committed a crime. Dunbar was holding Carriger's boots in his hand and Dunbar told Carriger he had just used his boots in the commission of a crime. Dunbar said the boots were "hot" as he left tracks with them at the scene. Carriger put the boots on. Dunbar showed Carriger the loot and offered it to Carriger in satisfaction of a debt Dunbar owed. The day before the crime Carriger loaned $100 to Dunbar. The day of the crime Carriger loaned an additional $120 to Dunbar. Added to a previous debt, Dunbar owed Carriger approximately $450. Carriger discussed taking the loot in exchange for a partial satisfaction of the debt but ultimately refused because "the first of the month was coming and I had no leeway. I needed money, not that garbage."

Around 6:30 p.m. Dunbar offered to "pay for my first piece of tail after being out of the joint." [2] While there, Carriger told the prostitute he felt like he was being "set up." Dunbar tried to sell one of the stolen articles to an employee of the "massage parlor." The girl became suspicious and called a friend. Carriger knew who she was talking to and spoke "prison slang" [3] to calm her fears.

The two men then went to a shopping mall where Dunbar tried to sell some jewelry. Dunbar purchased a new pair of shoes for Carriger. Later, he handed Carriger money. But neither of these acts reduced the amount Dunbar owed Carriger.[4] We conclude that Carriger's testimony would have been detrimental to him. His testimony contradicts other matters in the record; for example, in one of Carriger's handwritten notes he states that he was at the convenience store until 5:15 p.m. On the stand he said he was there until about six. If the former is correct, he would have had the time to commit the crime.

2. A Yes. Then we were joined by another lady by the name of Diane.
Q Okay. And then what happened?
A I was with her for about a half an hour and—
Q You had sexual intercourse, I take it?
A I'm not going to admit to any such thing. That's a felony, or at least it is in my book.
Q You are not going to tell me whether you did or didn't?
A No, I'm not.
Q You are not going to deny it.
A I'm not going to deny it.
Q Who paid for it?
A Bobby did.

3. ... I commented that I knew a guy at the joint who had some expertise with diamonds and I asked if it was the same person, and she said it was and at that point I went into a general convict jargon line to be related to Chet, to let him know who I was and the fact that I was out, et cetera.
Q Okay. You were speaking in prison slang?
A Yeah.
Q Tell me exactly what you said?
A You sure you want it exact?
Q I'm positive I do.
....
A I told her to tell that mother fucker I was out and he ought to up my money. He left the joint owing me $15 and it was a standing joke because the debt was at least two years old.

4. Q Okay. So, how much did he owe you by the end of the evening?
A I wasn't deducting any of that.
Q So, he still owed you $450 in your mind?
A Yes. May I make a clarification?
Q Ordinarily not, but go ahead.
A In prison deals and that is the level that I always dealt with Dunbar on, there is no change in the deal unless it is clearly understood by both parties. It is never changed just on one side of the fence.
Q So, your deal was still the same by the end of the day, that he still owed you 450?
A Right.

He also corroborates the bulk of Dunbar's testimony. His testimony concerning the morning of the crime is almost exactly that of Dunbar's. His testimony concerning the evening is similar to Dunbar's (Carriger basically denied he and Dunbar drove around Phoenix throwing evidence away). The major difference is the actual time of the crime. Carriger claims he was near his truck; Dunbar's testimony is that Carriger was at the scene.

Because there is substantial corroboration of Dunbar's testimony in Carriger's testimony, we find that the jury would not have been persuaded to accept Carriger's uncorroborated testimony concerning what he did at the time of the crime. Thus, Carriger has not established that he was prejudiced.

Carriger next argues that the prosecutor vouched for Dunbar during closing arguments and Gay's failure to object to it constitutes ineffective assistance of counsel. We agree, although we do not find it to be prejudicial error. The prosecutor said, "If there [was] any indication of [Dunbar's] guilt or complicity in this, he would be on trial with [Carriger]." Such a statement was improper. However, taken in context, we do not think the prosecutor intentionally made an unfair comment.

Although this was misconduct, we do not find it to be prejudicial because the prosecutor was stating what had to be patently obvious to the jury already. The jury knew Dunbar had received immunity for a burglary he had attempted three days before this murder in return for his testimony. The jury knew from the evidence that the police believed Dunbar (one officer testified he never caught Dunbar in a lie and everything Dunbar told him about this case was accurate) and, because Carriger, and not Dunbar, was being tried, the jury implicitly knew the prosecutor believed Dunbar. Thus, this statement merely pointed out the obvious. If this statement had not been made, the result would have been the same. *See Strickland, supra.*

Carriger's last allegations of error concern Gay's failure to offer any jury instruc-

tions and his failure to object to certain instructions. We do not think that Gay's failure to offer any jury instructions constitutes ineffective assistance of counsel. We note that Gay did request instructions for lesser-included homicide offenses. Thus, Gay's failure to offer any instructions may have been a decision on his part that his client was well served by the court's instructions. We have reviewed the jury instructions and conclude the jury was properly instructed, *see State v. McNair*, 141 Ariz. 475, 481 687 P.2d 1230, 1236 (1984); therefore, Carriger's claim is without merit. *See Watson, supra; see also Strickland, supra.*

Carriger claims Gay should have objected to the following instruction because it shifted the burden of proof:

> The state must prove that the defendant has done an act which is forbidden by law and that he *intended* to do it. You may determine that the defendant *intended* to do the act if he did it voluntarily .... (emphasis in original.)

Carriger's claim is without merit. *See State v. Spoon*, 137 Ariz. 105, 109–10, 669 P.2d 83, 87–88 (1983) (upholding same instruction).

Carriger's last allegation of error at trial is that the trial court created confusion by giving a second-degree murder instruction, yet failed to give a second-degree murder-verdict form. The trial court gave the murder instruction from *Recommended Arizona Jury Instruction, Crimes 4, Murder; see State v. Pittman*, 118 Ariz. 71, 73, 574 P.2d 1290–93 (1978) (for identical and complete instruction). The objectionable language, Carriger alleges, is:

> If you have a reasonable doubt about which of the two degrees of murder was committed, you must decide it was second-degree murder.

The trial court explained its reason for using the above language:

> The instruction making reference to the second degree murder was clearly a definition for the jury as to what first degree murder was. In the facts presented, the defendant was either

guilty or not guilty of first degree murder.

Assuming the language objected to constitutes error, we find it to be harmless error. *See State v. Thomas,* 130 Ariz. 432, 436, 636 P.2d 1214, 1218 (1981). The evidence will only support a first-degree murder conviction. The victim was bound. The victim was strangled with his own tie. There is no doubt the killing was in the first degree and we do not think the jury could have been confused by the language to which Carriger objects.

## POST-TRIAL CLAIM OF INEFFECTIVENESS

■ Finally, Carriger argues that Gay was presented with newly discovered evidence after trial, yet peremptorily dismissed it as frivolous without presenting the evidence to the court. After Carriger was arrested, a woman who thought she knew him came to see him. When she discovered her mistake, she remained anyway and talked with him. They became friends. After the verdict was returned, she went to Dunbar's house hoping to find evidence of Dunbar's guilt the police had missed. This was approximately four months after the crime had been committed. While there she found in Dunbar's backyard a pair of "bloody" pants, along with other items of clothing. She testified at the Rule 32 hearing that she went to see Carriger and asked him to describe the clothes Dunbar wore on the day of the crime. Without knowing of her "evidence," Carriger perfectly described the clothes she had found. She then gave the clothes to the police and received a receipt for them. Within hours the clothes were returned to her. The police determined that there were no bloodstains on the

clothes. The woman then threw them away. She never told Gay about the existence of the clothes.

The facts indicate that the clothes were destroyed before Gay was aware that they had been found. In addition, the police had already discounted the evidentiary value of the clothes. And the proponent of the evidence was Carriger's friend who went to Dunbar's house for the express purpose of finding evidence. Gay's refusal to present this "evidence" to the court is not an indication of ineffectiveness, as the evidentiary value of the clothes—considering the circumstances surrounding their finding—was minimal, especially since the proponent of the evidence had discarded them.

In conclusion, we find that Carriger was not prejudiced by Gay's action, even in those instances when Gay's actions fall below the *Watson* standard. There is no doubt that Dunbar's testimony was important to the state, but we note that trial co-counsel (who did not conduct any of the pretrial investigation and who was not present for the entire trial) for the defense testified at the Rule 32 hearing and said that if Dunbar had been impeached with the information Carriger now has, it would not have changed the verdict.[5] At the conclusion of the Rule 32 hearing, the trial judge indicated that she thought that if Dunbar had been impeached as Carriger now desires, it would not have changed the verdict.

In making our decision, we have considered "the totality of the evidence before ... the jury," *Strickland, supra,* —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 698, plus the information Carriger claims should have been presented. We find that Carriger has not met his burden of showing that the verdict "would reasonably like-

---

5. Q You agree with me, would you not, that there would be a substantial chance for a different result if there was an investigation conducted with facts showing that the chief witness in this particular case had an abject reputation for truthfulness, you agree with that, wouldn't you?
 A No, I would not. I have been doing this a long time now, Mr. Bayles and you lead me to that question, you know; you and I both

know that you take the witnesses where you find them, and in a criminal case you commonly don't have a saint who is sitting on the witness stand pointing the finger at crime and in this case the State took what they had. I think the results would have been the same even if we would have attacked Mr. Dunbar effectively, but that's my subjective opinion, that's not—"

ly have been different absent the errors" *Id.* We hold that the trial court's denial of Carriger's Rule 32 petition was not an abuse of discretion.

RESENTENCING

Carriger raises several issues dealing with resentencing. We will consider them seriatim.

*Death Penalty Unconstitutional*

A. Right to Jury

■ Carriger asserts that he has a right under the sixth amendment and Ariz. Const. art. 6, § 23 to have a jury participate in sentencing. Carriger argues, as did petitioner in *State v. Jordan*, 137 Ariz. 504, 506, 672 P.2d 169, 171 (1983), that he has a right to a jury finding that the statutory aggravating circumstances exist. This claim is without merit. *See id.*

B. Guidance in Balancing Aggravating and Mitigating Circumstances

■ Carriger argues that our death penalty statute, A.R.S. § 13–703, is unconstitutional because the trial court is not required to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim is without merit. *See State v. Jordan, supra,* 137 Ariz. at 508, 672 P.2d at 173. Carriger asserts that the burden of proving mitigating circumstances should be on the state. This claim is without merit. *See State v. Watson, supra,*

C. Racial Bias

■ Carriger argues that our death penalty is unconstitutional because the penalty is arbitrarily and capriciously imposed. He claims that individuals who kill Caucasians are much more likely to receive the death penalty than the killers of non-Caucasians. He claims that racial bias is the reason a disproportionate number of killers of Caucasians receive the death penalty.

We have upheld the constitutionality of the death penalty statute against various challenges. *See, e.g., State v. Jordan, supra; State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105, *cert. denied,* — U.S. ——, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

An associate in the law firm of Carriger's present counsel compiled data on the homicides that occurred in Arizona in recent years. He then called a statistics professor at an Arizona university and gave the figures to the professor to work on. The statistics professor testified on direct examination at the Rule 32 hearing that he concluded the race of the victim was a factor in determining who receives the death penalty in Arizona. On cross-examination the professor testified that he could not identify the exact factor that operates to create the claimed racial imbalance. The professor said "at some stage or stages of the process, race has to play a role. Whether it was a role having to do with bias or not, the figures do not and cannot answer." Later, the state's attorney asked: "There could be an X factor out there, involving no human discretion at all, that you're not aware of, that would make your study incorrect, is that correct?" Answer: "That's correct." On redirect the professor testified that race

> appears to be a factor, which means it's associated with the decision—or associated with the process by which a person comes under the death sentence. Whether bias is the cause or whether it is, as the prosecutor suggested, an X factor, isn't possible to say on the basis of this data.

Q But my question to you, sir, is: Bias could be a cause?

A Bias could be a cause.

Q You simply don't know?

A I simply don't know.

We cannot declare our death penalty unconstitutional on such speculative evidence. The data was gathered by an attorney, not trained in research of this kind, who is in the same law firm as Carriger's counsel, and who said his stated purpose was to support their speculation that the death penalty was imposed in a racially biased

manner. Moreover, the research did not take into account: 1) whether the homicides that occurred during the time studied were justified or unjustified homicides; 2) if unjustified, what degree of homicide each killing was; 3) whether the homicides, if first degree murder, involving nonwhite victims, were solved or unsolved; and 4) if unsolved, whether racial bias was a factor at that stage. In sum, there were many unasked questions, which must be answered before we can determine if a claim of racial bias has merit. On this record the claim is not meritorious.

*Propriety of Imposing the Death Penalty on Petitioner*

A. Aggravating Circumstances

The trial court found the following aggravating circumstances: Carriger "was previously convicted of a felony in the United States including the use or threat of violence on another person," A.R.S. § 13–703(F)(2); the murder was committed "in an especially heinous, cruel or depraved manner," *id.* at (6); and the offense was committed in expectation "of anything of pecuniary value," *id.* at (5). Carriger does not challenge the first aggravating circumstance.

Carriger argues that the murder was not heinous, cruel or depraved. We have an independent duty to review the evidence dealing with sentencing and make our own decision regarding whether the death penalty is warranted. *See State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980).

The statutory expression of heinous, cruel, or depraved is in the disjunctive, and all of the expressions or one of them "could constitute an aggravating circumstance." *State v. Gretzler, supra,* 135 Ariz. at 51, 659 P.2d at 10. Cruelty is found when physical pain or mental distress is suffered by the victim. *Id.* "[H]einous and depraved go to the mental state and attitude of the perpetrator as reflected by his words and actions." *Id.* Heinous means "hatefully or shockingly evil; grossly bad," and depraved means "marked by

debasement, corruption, perversion or deterioration." *Id.*

We find the victim suffered mental distress and we agree with the finding of cruelty. The victim pleaded with Carriger for his life. Carriger then bound the victim, and the victim, fearing for his life, was unable to do anything to avoid the blows. The inference is that the victim suffered the terror of being uncertain as to his fate and being helpless to avoid the assailant. *Id.*

The murder was heinous and depraved. The evidence reveals that the victim was bound and helpless and the blows came from behind the victim. *Id.* at 52, 659 P.2d at 11, the victim was unable to hinder Carriger's flight, making the crime senseless, *id.,* and Carriger inflicted gratuitous pain on the victim. *Id.* Carriger used three separate forms of attack to kill the victim. He struck the victim with a skillet so hard that pieces of the skillet flew off and the victim's brain was "jelled loose"; he then struck the victim in the head with a pointed object; finally, he used the victim's tie to strangle the victim. The bloody scene and the mutilation of the victim's head tend to prove the crime was heinous and depraved.

Carriger argues that the finding of pecuniary gain is unlawful for two reasons: first, it was specifically not found at his first sentencing and he claims the state is now barred from proving this circumstance; second, the facts needed to prove this circumstance are the same facts needed to prove the underlying felony of robbery.

We find Carriger's arguments to be without merit. The state was not barred from proving this circumstance as the law had been clarified between the original sentencing and resentencing. *See State v. Gretzler, supra,* 135 Ariz. at 47, 651 P.2d at 8; *State v. Jordan, supra,* 137 Ariz. at 507, 672 P.2d at 172. The facts did not change and they would have supported this finding at the original sentencing. The only change was the judicial construction of the statute. At the time of the first

sentencing this court had not held that pecuniary gain was defined to include a robbery.

 The court may find the aggravating circumstance of pecuniary gain when the basis of the first degree murder conviction is felony murder and the felony is robbery. For purposes of this argument we must accept Carriger's argument that he was convicted of felony murder and not premeditated murder because the record does not indicate what form of first degree murder the jury relied on. In *State v. Bly,* 127 Ariz. 370, 621 P.2d 279 (1980), we addressed a similar claim in a non-capital case. In *Bly,* appellant argued that a single factor, use of deadly weapon, increased his sentence for robbery in several ways. We agreed but we determined that the increased punishment was not unlawful. We said that "[p]ower resides with the legislature to define that conduct which will not be tolerated in an ordered society and to provide punishment for those who violate public policy." *Id.* at 371, 621 P.2d at 280. When an individual is murdered for the pecuniary gain of the assailant, we think the legislature can properly punish this more severely than other first degree murders, and we abide by their decision. *See id.* at 373, 621 P.2d at 282. Finally, Carriger is not being "punished time and time again for a single act." *Id.* He is merely receiving a substantial punishment "for a single severe crime." *Id.*

Also, the state must prove additional facts to prove the aggravating circumstance of pecuniary gain once it has proved the robbery. Thus, the state is not relying on the same facts to prove an element of robbery and the aggravating circumstance. To prove robbery, the state must show a *taking* of property from the victim, *see* A.R.S. § 13–1902(A); to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain, *see* A.R.S. § 13–703(F)(5). Proving a taking in a robbery does not necessarily prove the motivation for a murder, and the state cannot be said to be using one fact to prove two different items. We conclude

that the aggravating circumstance of pecuniary gain was lawfully found to exist in this case.

## B. Mitigating Circumstances

Carriger claims that the mitigating circumstances are of sufficient weight to call for leniency. He argues that his life should be spared because: he saved the life of a fellow death-row inmate; he risked retaliation to ensure the safety of a state employee; he conducted a survey of death-row inmates designed to uncover why individuals became killers; he writes poetry and fiction and paints; he has been a model prisoner while on death row; he loves and is loved by his family; there exists doubt in the verdict of guilt; he still maintains his innocence; and there are sufficient doubts about his accuser to call for life imprisonment instead of the death penalty. As noted above, in this area we are not bound by the trial court's determination; we make an independent determination. *See State v. Ceja, supra.*

 Without doubt, Carriger's action in saving the life of another inmate is evidence in mitigation. Additionally, a female prison counselor's safety was put in jeopardy by the irresponsible gossip of a prison guard. The guard told a group of death-row inmates that the counselor was sexually available to them. Carriger told the counselor about the incident and repeated his story to prison officials, so the matter could be resolved without harm to the counselor. By reporting the incident, Carriger risked retaliation from the other prisoners. We view his efforts to use proper prison lines of communication to resolve this matter as mitigating evidence.

Carriger has conducted a survey of other death-row inmates, with the stated purpose of determining what turns men to kill others. We view this as immaterial and, if mitigating, its weight is not great. Carriger told the trial court he was not sure why he was working on the survey, but he was sure he wanted to live. The state successfully portrayed Carriger's actions as trying to comply with *State v. Watson, supra,*

and not the result of genuine interest. Also, no adequate evidence was produced that would indicate the survey would be useful.

Carriger claims he has been a model prisoner on death row and this is mitigating evidence. At the hearing, prisoner officials were asked to define a model prisoner and differing answers were given. One witness said that a model prisoner interacts well with fellow inmates. Carriger avoids other prisoners. Another witness said when an inmate socializes with other inmates, cliques are formed and often a prisoner is drawn into trouble against his will by the group. Thus, on this record, we cannot hold against Carriger the fact that he chooses not to interact with other convicted murders. As Carriger pointed out, an inmate was murdered on death row, and associating with other inmates can be dangerous. Carriger is polite to prison officials, and has few disciplinary write-ups. Carriger, however, does not use any of the prison facilities designed to aid prisoners, such as counseling. Carriger has spent most of his time since his early teens behind bars, and he indicated that he had great difficulty adjusting to the world outside of prison. However, Carriger has not sought counseling, apparently because he believes he does not need it. We think this shows that Carriger has not recognized his antisocial conduct as a problem. We consider this too in our determination.

Carriger claims that his love for his family and the love they have for him is mitigating evidence. We agree. However, the love between Carriger and his family has not stopped Carriger from what amounts to a lifetime of crime, and we must consider this too.

Carriger claims that there is doubt in the verdict and this is mitigating evidence. He states that the beyond a reasonable doubt standard does not require a jury to find that a defendant committed the crime charged beyond all doubt. He concludes that the doubt in the verdict exists in the difference between absolute certainty and the beyond a reasonable doubt standard,

and this doubt should be considered in favor of defendants. We disagree. No man may be convicted of a crime if there is a reasonable doubt as to his guilt. We reject Carriger's claim.

■ Carriger argues that because he maintains he is innocent, this should be mitigating evidence. The trial court found that Carriger's refusal to acknowledge his guilt was to be held against him. We think it is neither mitigating nor a fact that should be held against Carriger. A defendant is guilty when convicted and if he chooses not to publicly admit his guilt, that is irrelevant to a sentencing determination. If a defendant admits his guilt, this can be used as additional mitigating evidence, provided the defendant is truly remorseful for his crime.

Last, Carriger argues that the state's main witness, Robert Dunbar, is sufficiently untrustworthy so that the state ought not execute a person based on Dunbar's testimony. We disagree. The record reveals that important aspects of Dunbar's testimony are corroborated by uncontradicted testimony. Carriger also corroborates some points of Dunbar's testimony. The jury found Dunbar's testimony to be reliable, and after reviewing the entire record of this case, we cannot find the jury's reliance on Dunbar's testimony unjustified.

We find the mitigating evidence is not sufficiently substantial to call for leniency. The brutality of the attack alone sets this case far apart from other murders.

The ruling of the trial court dismissing the Rule 32 petition is affirmed. The sentence is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

FELDMAN, Justice, dissenting in part, concurring in part.

I cannot agree that trial counsel's pretrial investigation and preparation met the standard for effective assistance of counsel or that the issue is precluded. Unfortunately, I also cannot agree with the court's

conclusion that an attorney's complete failure to investigate and prepare a capital case can be anything but prejudicial error.

To hold, as the majority does, that no matter what was done, the "jury would not have been persuaded to accept Carriger's uncorroborated testimony concerning what he did at the time of the crime ... [so that] Carriger has not established that he was prejudiced" (at 106) is to conclude simply that this court believes Carriger is guilty and therefore did not need representation. One may justifiably wonder why we bother to try defendants before a jury when appellate courts assume the power to weigh the evidence and divine what the jury would or would not have believed. We are not given the gift of divination, only the duty of decision.

I prefer the more conservative approach of determining whether the evidence not offered was the type which might have influenced the jury and thus might have affected the verdict. If it is not, then the error is harmless; if it is, the error is prejudicial. Until today that seemed to have been the test in Arizona.

> Not all extraneous information is so prejudicial as to require reversal. The standard ... is that the defendant is entitled to a new trial if it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict. [Citations] We adopt the reasonable possibility standard applied by the Ninth Circuit as an appropriate balancing test and in harmony with the standards applied in other circuits. *See, e.g.,* ... *United States v. Marx,* 485 F.2d 1179 (10th Cir.1973), *cert. denied* 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974), 'slightest possibility that harm could have resulted'; ... *Farese v. United States,* 428 F.2d 178 (5th Cir.1970), 'reasonable possibility that information affected the verdict.'

*State v. Poland,* 132 Ariz. 269, 283, 645 P.2d 784, 798 (1982). Thus, we are not to decide what the jury would have believed, but whether the evidence, if believed, possibly or probably would have had an effect on the verdict.

With these traditional tests in mind, we must look at the facts regarding the claimed ineffective assistance of counsel in the case at bench. First, the court correctly holds that many of the claims raised by defendant are precluded because they could have been raised on appeal. On a subsequent Rule 32 petition, however, defendant cannot be precluded from raising those claims of ineffective assistance which are based upon information obtained *after* his direct appeal had been decided. It is precisely to allow contentions based upon after-acquired information that Rule 32 was adopted. *See Standards Relating to Post-Conviction Remedies* § 2.1 commentary at 33 (1967).

The case is not complicated. The facts left only two possibilities. The murderer was either Carriger or Dunbar (or, perhaps, both). Carriger was the defendant and Dunbar was the state's only direct witness. To procure Dunbar's testimony, the state agreed not to prosecute him. Such deals may be necessary at times, but when one is made, we—and the jury—are obliged to suspect the ensuing testimony. There was no direct evidence of Carriger's guilt. The case was tried, therefore, on a simple basic issue: Did Dunbar tell the truth when he blamed the robbery and murder on Carriger, or was Carriger's contention that the robbery and murder were committed by Dunbar to be believed? All other issues were peripheral. To corroborate his story and his credibility, and to rebut Carriger's charges against him, Dunbar testified that he could not have committed the robbery and murder because by both history and nature he was neither a robber nor a killer; his long criminal history showed only participation in nonviolent crimes.

While Dunbar was impeached in many ways, none of them addressed these fundamental contentions. Impeachment on these issues was available. Carriger, who had known Dunbar in prison, specifically asked trial counsel to obtain Dunbar's prison

records and inspect them for impeachment information. Trial counsel failed to do so. The majority seems to excuse this rather glaring omission by indicating that the case permitting discovery of such files was not decided until three years after Carriger's conviction (slip op. at 20). *See State v. Morales*, 129 Ariz. 283, 630 P.2d 1015 (1981). The majority fails to acknowledge, however, that four years before Carriger's trial the United States Supreme Court had ruled that such information was subject to discovery. *Davis v. Alaska*, 415 U.S. 308, 319–20, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974).

We now find that the file which trial counsel was requested to obtain, which he had a right and duty to obtain, and which he did not attempt to obtain, contained information that directly impeached some of the key statements which Dunbar made on the witness stand. For instance, while Dunbar portrayed himself as a person who would not rob because he could not use violence or threat of force, there was evidence in the file that he had committed armed robberies in Phoenix and in California. While Dunbar claimed innocence because he could neither kill nor comprehend the act of killing, there was evidence in the file that he had twice attempted to carve his father and mother with a butcher knife. While Dunbar claimed that he would not lie and implicate a "buddy," there was evidence in the file that over a period of years he had several times committed a crime and then called the police to turn in his "buddy." While Dunbar was portrayed by the state as a peaceful person and a credible witness, there was evidence in the file that he was in fact a violent, habitual criminal, ready to lie for any reason or simply as a matter of habit. While the state portrayed Dunbar as an accurate observer and reporter of events, the file indicated that he had been committed twice to the state hospital for the insane.

The majority argues that none of this would have made a difference because most, if not all, of the information in the file was not in admissible form. (At 1000–1002) The majority mistakes the issue.

The issue is not whether the information would have been independently admissible; it is what use might have been made of such information by a skillful cross-examiner. It is impossible to believe that experienced trial counsel, cross-examining a man whom the state described at oral argument as a "cross-examiner's dream," would not have made considerable progress with this information. He might, for instance, have asked Mr. Dunbar to repeat his direct testimony about being a peaceful, nonviolent man who could not comprehend murder and then have asked him to explain the manner in which he had used the butcher knife on his mother. No purpose is served by further speculation. Experience with juries teaches us that skillful cross-examination of such a target with the ammunition in the file might have destroyed the witness. The majority, not impressed, holds that the jury still would have believed Dunbar. I have no way of knowing this, nor does the majority; most lawyers would conclude that such cross-examination is the type directly calculated to affect a juror's belief of the witness' testimony.

In arguing that the information in the file was "inadmissible," the court also ignores the precept that one of the prime purposes of discovery is to obtain information that will lead to the discovery of admissible facts. It will not do to argue that the hearsay statements in the file were not independently admissible without acknowledging that the information would have provided a lead by which counsel could have obtained certified copies of records and other documents which could have been offered in evidence. The majority argues that they may have been remote and therefore irrelevant and would not have been admitted. That decision, I believe, is one for the trial judge under Rule 403, Ariz.R.Evid., 17A A.R.S. It involves a weighing of the circumstances. Given the serious nature of the crimes charged, the direct conflict between Dunbar and Carriger, and whatever mileage counsel might have made by impeachment with the information contained in the file, it is impossible

for us to say at this date what the trial judge would or would not have done in making the discretionary decision required of him under Rule 403.

This court has already found the same trial counsel to have been ineffective at the sentencing stage of this proceeding. *State v. Carriger* (Carriger II), 132 Ariz. 301, 645 P.2d 860 (1982). The standard applied at that time was "sham, mockery or farce." The record of the trial proceeding with which we now deal reveals no less a mockery of effective trial representation. No *Brady* motion was filed, although the client sent numerous notes telling the lawyer what should be done and what information should be requested. Twenty witnesses, including Dunbar, testified for the state, but defense counsel interviewed only Dunbar and that for only a couple of hours. Counsel's investigator interviewed only two or three of the other witnesses. Counsel made no motion under Rule 15, Ariz.R. Crim.P., 17 A.R.S., to obtain information on Dunbar's past.

The state candidly concedes that a competent lawyer would have realized that the key to the case lay in Dunbar's credibility, so that everything possible should have been discovered about Dunbar's childhood, schooling, military record and criminal record. Almost nothing was done. To conclude, as the majority does, that it wouldn't have made any difference is to render the guarantee of effective assistance of counsel meaningless. This court has no way of knowing whom the jury would have believed. It can only judge, consistent with the standard in the past (*State v. Poland, supra*), whether the evidence not presented was of the type calculated to have influenced jurors. With respect to the information contained in the prison file, that answer must be affirmative.

In *State v. Lee*, 142 Ariz. 210, 214, 689 P.2d 153, 157, we adopted the *Strickland* test (*Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052 (1984)) and held that because the defendant is in a better position than the state to determine the prejudicial effect of errors of trial counsel, we would not reverse for ineffective assistance of counsel unless the defendant carried the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (142 Ariz. at 214, 689 P.2d at 157.) We may have changed the burden of proof, and properly so, but surely this court did not impose upon a litigant the burden of showing that which it is never possible to show. One cannot offer proof of what would have happened had the lawyer done something which he failed to do. One can show only that the type of omission was one which had a reasonable probability of affecting the jury's perception of the credibility of the witness. This is the rule we set in *Poland*. I gather it is now overruled *sub silentio*.

The new rule established today is one which allows this court, and those who follow us on the bench, to reach any result which they may desire in a particular case by simply deciding, on an unarticulated and subjective basis, that the jury would not have believed the evidence or would not have disbelieved the witness, regardless of the nature of the evidence or the character of the witness. The rule of law is essentially subverted when judges assume such power. The case should be remanded for retrial.