Paris Hoyt CARRIGER, Petitioner–
Appellant,

v.

Terry L. STEWART, Respondent–
Appellee.

No. 95–99025.

United States Court of Appeals,
Ninth Circuit.

Argued (by telephone) and Submitted
Nov. 29, 1995.

Filed Nov. 29, 1995.

Opinion Withdrawn Sept. 10, 1996.

New Opinion Filed Sept. 10, 1996.

As Amended Sept. 24, 1996.

Denise I. Young, Arizona Capital Representation Project, Tempe, AZ, for petitioner-appellant.

Joseph T. Maziarz, Assistant Attorney General, Phoenix, AZ, for respondent-appellee.

Before: FARRIS, KOZINSKI and O'SCANNLAIN, Circuit Judges.

## ORDER

We have reconsidered Carriger's appeal in light of *Thompson v. Keohane*, —— U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), and the parties' further submissions. The opinion filed November 29, 1995, is withdrawn. A substitute opinion is filed concurrently.

## OPINION

KOZINSKI, Circuit Judge.

Paris Hoyt Carriger is a death row inmate in Arizona. We consider several of his claims, including whether he has met the burden of showing actual innocence articulated in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

## I

The petitioner in *Herrera* argued that it would be unconstitutional to execute him because new evidence showed he was innocent of his crime. The Court did not decide whether such a claim could ever succeed; it ruled only that Herrera had failed to make "a truly persuasive demonstration of actual innocence." *Id.* at 417, 113 S.Ct. at 869; *see also id.* at 426–28, 113 S.Ct. at 874 (O'Connor, J., concurring, joined by Kennedy, J.).

 It is therefore still an open question whether the government may execute someone for a crime he can prove he did not commit.[1] The Supreme Court *has* made clear, however, that, for such a claim to ever be successful, the defendant's burden of proof would "necessarily be extraordinarily high." *Id.* at 417, 113 S.Ct. at 869 (opinion of the Court). Indeed, in *Schlup v. Delo*, ─── U.S. ───, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court specified that a *Herrera* claim would fail if the petitioner did not present new facts that "unquestionably establish [his] innocence." *Id.* at ───, 115 S.Ct. at 862.[2] This requires petitioner to prove that he did not commit the crime; his claim fails if he shows only that he would no longer be found guilty beyond a reasonable doubt. *Compare id.* at ─── n. 47, 115 S.Ct.

at 868 n. 47 (a *Herrera* claim requires a showing of "factual innocence") and *id.* at ───–───, 115 S.Ct. at 860–62 (the test of a *Herrera* claim is whether the petitioner is "unquestionably ... innocen[t]") *with id.* at ───, 115 S.Ct. at 868 (the test of a *Schlup* claim is whether "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). That the state's case against him is weak may support an inference of innocence, but it need not; defendant may be guilty even though the state has a weak case. Once the state has overcome the presumption of innocence by obtaining a conviction based on sufficient (even if not overwhelming) evidence, the defendant can no longer prevail by pointing to the gaps in the state's case; to save his life, he must go much farther and affirmatively establish that he did not commit the crime.

While the Supreme Court has not specified the standard of proof the prisoner must satisfy to establish a *Herrera* claim, the Court's statement in *Schlup* that the petitioner must "unquestionably establish [his] innocence," ─── U.S. at ───, 115 S.Ct. at 862, suggests that he must do better than a preponderance of the evidence. At the same time, we believe the Court would have been more explicit had it meant to require that petitioner shoulder the same burden as the prosecution at trial, by proving his innocence beyond a reasonable doubt. We therefore hold that a petitioner seeking to prove actual innocence under *Herrera* must do so by clear and convincing proof.

The Supreme Court has suggested that federal habeas relief would only be available

1. The district court held that *Herrera* foreclosed any claim of actual innocence. *See* Memorandum of Decision and Order at 10. We have held in two non-capital cases that *Herrera* precludes habeas relief based solely on a petitioner's actual innocence of the crime. *See Coley v. Gonzales,* 55 F.3d 1385, 1387 (9th Cir.1995); *Swan v. Peterson,* 6 F.3d 1373, 1384 (9th Cir.1993). We have also implied in a capital case that *Herrera* forecloses habeas relief based solely on a petitioner's actual innocence of the death penalty. *Clark v. Lewis,* 1 F.3d 814, 821 (9th Cir.1993). Two of the five justices who joined the majority opinion in *Herrera,* however, made clear in a separate concurrence that *Herrera* does not fore-

close habeas relief in a capital case based on a "truly persuasive demonstration" that the petitioner is actually innocent of the crime. 506 U.S. at 426–27, 113 S.Ct. at 874 (O'Connor, J., concurring, joined by Kennedy, J.). The district court erred in holding to the contrary.

2. Carriger is thus mistaken in suggesting that the test of a *Herrera* claim is whether all the currently available evidence is sufficient to find guilt beyond a reasonable doubt. *See* Appellant's Opening Brief at 13–14 (citing *Herrera,* 506 U.S. at 428–29, 113 S.Ct. at 875 (White, J., concurring)).

on the ground that petitioner is actually innocent "if there were no state avenue open to process such a claim." *Herrera,* 506 U.S. at 417, 113 S.Ct. at 869; *Schlup,* —— U.S. at —— n. 28, 115 S.Ct. at 860 n. 28. The Court may have meant only that a would-be *Herrera* claimant must exhaust his state remedies—possibly including executive clemency, *Herrera,* 506 U.S. at 410–18, 113 S.Ct. at 866–69—before a federal court may consider his *Herrera* claim on the merits. Alternatively, the Court may have meant that federal habeas relief is never available on this ground to a petitioner who has already received, or could still receive, a state decision on the merits.

■ We leave this question for another day and assume that the former rather than the latter interpretation of *Herrera* is correct; we also assume that a petitioner need not seek executive clemency to exhaust state remedies for *Herrera* purposes. Carriger presented his new evidence of innocence to an Arizona state trial court during 1987 and 1994 post-conviction proceedings; the state court rejected Carriger's claims. ER Exs. 9–10. Under our assumptions, this entitles Carriger to a decision on the merits of his *Herrera* claim in federal court. The state court held a hearing to evaluate the new evidence Carriger presented in 1987. *See* ER Ex. 9. We accord its post-hearing findings as to basic facts, including witness credibility, the presumption of correctness they would normally enjoy in federal habeas proceedings. *See Marshall v. Lonberger,* 459 U.S. 422, 432–35, 103 S.Ct. 843, 849–51, 74 L.Ed.2d 646 (1983).[3] We decide de novo whether Carriger has shown he is "unquestionably . . . innocen[t]," *Schlup,* —— U.S. at ——, 115 S.Ct. at 862, given the facts properly found by the state court. *See Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

■ The cornerstone of Carriger's *Herrera* claim is Robert Dunbar's testimony in 1987 state post-conviction proceedings. Dunbar was the principal witness against Carriger at his 1978 trial for the murder of Robert Shaw. R.T. 10–20–82 (3:10 p.m.) at 55–56. In exchange for his testimony, the State gave Dunbar immunity for his involvement, if any, in the Shaw murder and any other "crime committed by him prior to the date" of the immunity agreement. ER 482.

Carriger had met Dunbar in prison years before. After both men were released, Carriger moved his van onto Dunbar's property. R.T. 10–21–82 (1:45 p.m.) at 27–28. Dunbar's story at trial was that, on the night of Shaw's murder, Carriger admitted to Dunbar that he had robbed Shaw's jewelry store and killed Shaw, the only witness. Carriger allegedly described binding Shaw's hands, crushing his skull with an iron skillet and strangling him to death with his own necktie. R.T. 7–13–78 at 31–32. But in 1987 post-conviction proceedings, Dunbar claimed that he himself had murdered Shaw and framed Carriger. ER 241–52, 272–96.[4] Dunbar said he had previously confessed this to a minister, ER 255, 261–62, to his parents, ER 367–68, to his lawyer, ER 349–56, and to a woman he met through a prison ministry, ER 299.

Dunbar wasn't the only trial witness who recanted during the 1987 post-conviction proceedings. Dunbar's wife, Joyce, testified at trial that Dunbar was home in bed with her at the time of the murder. R.T. 8–27–87 (10:39 a.m.) at 68–71. In the post-conviction proceedings, however, she claimed, as Dunbar's ex-wife, that her trial testimony was a lie. *Id.* at 23–24, 68–71. Dunbar threatened her before the trial, she explained, saying she would never see her children again unless she gave him an alibi for the murder. *Id.* at 29; *see also id.* at 44. She also testified in 1987 that Dunbar had admitted robbing

---

**3.** Had a federal district court conducted the threshold evaluation of the relevant evidence, by contrast, we would review its factual findings for clear error. Fed.R.Civ.P. 52.

**4.** Dunbar claimed that he committed the robbery with his wife, who first struck Shaw with the skillet; Dunbar said he then killed Shaw by hitting him repeatedly with the skillet and stran-

gling him with the tie. ER 241–42, 272–73. No one now suggests Dunbar's wife had any role in the Shaw robbery-homicide; this aspect of Dunbar's post-conviction testimony corroborates Carriger's claim only to the extent it shows that Dunbar was not above falsely accusing others of involvement in the murder.

Shaw's jewelry store with Carriger but murdering Shaw himself. *Id.* at 32–33.

Were we free to rely on Dunbar's and his ex-wife's recanting testimony, this would be a difficult case. Soon after his in-court confession, however, Dunbar wrote a letter to the state post-conviction judge claiming his post-conviction story was a fabrication. *See* ER 311. Dunbar then resumed the stand and testified that his various confessions were lies and that he had been telling the truth when he testified against Carriger at trial. ER 312, 323, 349–56, 365–66. At the close of the 1987 post-conviction proceedings, the state court found Dunbar's and his ex-wife's recanting testimony incredible. ER 163–62.[5]

■ The state court's credibility findings are presumed correct if fairly supported by the record. *See* 28 U.S.C. § 2254(d)(8); *Marshall,* 459 U.S. at 432–35, 103 S.Ct. at 849–51.[6] We find adequate support in the record for the state court's finding that ex-wife Joyce's recantation was not credible. The state court noted that Joyce testified Dunbar had told her that he and Carriger entered through the back door of the jewelry store, when in fact the store had no back door. As the state court also pointed out, Joyce's testimony requires us to believe that "someone would take a skillet to burglarize a jewelry store." ER 164. Joyce's credibility is further undermined by her patent hostility toward her former husband. *See* ER 438.

That the hostility may have been justified does not eliminate the possibility that she fabricated her recantation.

■ As for Dunbar, the record does not support the state court's finding that Dunbar's October 1987 testimony is less consistent with the physical evidence and witness testimony than his testimony at trial and in December 1987. We also find little support in the record for the state court's finding that Dunbar was incapable of "perpetrating or perpetuating" a scheme to frame Carriger, ER 166; Dunbar's 20–year history as a less-than-reliable police informant suggests that he was quite capable. However, we still presume the correctness of the state court's credibility determination because the record supports the state court's finding that Dunbar's confession was short-lived and motivated by "potential monetary gain and revenge." *See* ER 162, 312, 317–18, 322, 334, 403. The state court's finding is therefore binding on us and forecloses our reliance on Dunbar's recanting testimony. *See Marshall,* 459 U.S. at 432–35, 103 S.Ct. at 849–51.

Dunbar's recantation does, however, show his general unreliability as a witness. There are many reasons as well to doubt the reliability of his testimony in a robbery/murder trial. He had an extensive history of committing burglaries in the Phoenix area[7] and lying about his involvement therein.[8] Both

---

5. This portion of the Excerpts of Record is inaccurately numbered. The pages in the state court's decision should be read in the following order: ER 161, 165, 164, 163, 162, 166. Thereafter the pagination is correct.

6. The state has moved for leave to file a supplemental brief, in which it apparently would argue that parts of the recently enacted Anti-terrorism and Effective Death Penalty Act of 1996 apply retroactively to this case and strengthen the state's position. Section 104(4) of the Act, for example, requires clear and convincing evidence to rebut the presumption of correctness to which state court factual findings are entitled in federal habeas proceedings. The Act doesn't say whether this or the Act's other general habeas provisions are intended to apply to cases pending before the Act was signed into law. *See Williams v. Calderon,* 83 F.3d 281, 286 n. 2 (9th Cir.1996). We need not decide the extent to which the Act applies retroactively, however, as the result in Carriger's case would be the same. The state's motion for supplemental briefing is therefore denied as moot.

7. Dunbar began his career as a burglar at age 15. ER 516. In the six months following his first term of imprisonment for burglary, Dunbar committed nearly 100 burglaries. ER 500, 503. He was given probation but, following further burglaries, he received a 10–15 year sentence, of which he served five years. ER 526, 532. Dunbar continued burglarizing after his release, ER Ex. 31, and after the Shaw homicide. In fact, Dunbar claimed that one reason he confessed to the Shaw murder was to punish the state for "pushing so hard for me to get such a high sentence" for several burglaries in 1986. ER 313.

8. When he was arrested for burglary in December 1967, Dunbar falsely accused police officers of stealing hundreds of dollars discovered on him at the time of arrest. ER 500, 512. A month later, after being arrested for two more burglaries, Dunbar accused investigating officers of lying about the location of his fingerprints at the burglary scene. ER 501. He only confessed to the crime after police agreed to drop the charges.

before and after Carriger's trial, he was a frequent—and frequently unreliable [9]—informant for local law enforcement. ER 209, ER 374. Finally, throughout his life, numerous probation officers and mental health specialists remarked on Dunbar's capacity for manipulation and deceit.[10]

We therefore entertain serious doubts about Dunbar's credibility, and these doubts are particularly troubling because the government relied heavily on Dunbar's testimony in prosecuting Carriger. However, this only proves that the government's case was weak; it falls short of convincing us that Carriger is innocent of the crime.

The only other evidence that warrants discussion is a 1993 affidavit of one of Dunbar's former cellmates, recounting Dunbar's prison-cell confession. ER 203–04. In 1994, the Arizona state court found this confession to be unreliable. ER 175. The district court agreed, explaining:

> ER 501. In 1976, when police questioned him about the burglary of a title company in Phoenix for several thousand dollars, Dunbar claimed that he had discovered the money in bags lying on a street outside a bank. ER 535. When the police confronted him with the implausibility of this scenario, Dunbar asked, "How about a deal?" After the police agreed to a deal, Dunbar confessed. ER 536.

9. At the October 1987 hearing, Dunbar acknowledged that in his career as a burglar, he had often "shifted the blame to other people." ER 243. He did not deny this fact in his December 1987 testimony; in fact, he admitted that he had lied to the Attorney General "[i]n a lot of different cases and places." ER 346. He also stated, and several witnesses confirmed, that he had "passed polygraph exams that I should not have been able to pass." ER 167, 380.

10. When Dunbar was 17, a psychiatrist concluded that Dunbar spent "most of his psychological energy in attempting to find new ways of manipulating people." ER 506. Three years later, Dunbar was diagnosed as a sociopath. ER 484. A 1968 presentence report noted that Dunbar's "statements and countenance seem to be saturated with a false air of sincerity." ER 515. Another presentence report that same year noted that Dunbar was a "professional fault finder" in jail. ER 524. Another probation officer concluded that during the probation period Dunbar had "manipulate[d] th[e] officer and the Court into a satisfying of his own designs and wants." ER 522.

11. Other evidence Carriger points to incriminates Dunbar but, even if believed, does not

The affidavit does not say when Dunbar made these admissions. . . . In addition, [the] account of what Dunbar [said] would be inadmissible hearsay. There are no corroborating circumstances or other indicia of reliability. . . . Dunbar obviously had a strong motive to lie. . . . [He] was in a dangerous position having been labelled as a "snitch" in prison. It is clear from the affidavit that Dunbar "confessed" only because [his cellmate] pressured him for an explanation. It would be to his advantage to have other inmates believe he had murdered someone.

Memorandum of Decision and Order at 18. Given this confession's unreliability, see, e.g., *Herrera*, 506 U.S. at 417, 113 S.Ct. at 869 ("Petitioner's affidavits are particularly suspect . . . because . . . they consist of hearsay."), the cellmate's affidavit doesn't come close to satisfying Carriger's *Herrera* burden.[11] At bottom, Carriger simply points to

foreclose Carriger's involvement in Shaw's murder. Thus, Phoenix police detective Ronald Quaife stated, "I have a suspicion that Robert Dunbar was at the scene of the crime and participated in the homicide of Mr. Shaw." ER 209–10. Joyce's son, Larry, testified in 1987 that Dunbar bragged about lying when he took a polygraph test about the Shaw murder; that Dunbar admitted "participat[ing]" in planning the Shaw robbery; and that Dunbar said it was a "gruesome" thing to "watch[ ] someone get their head caved in with a skillet." R.T. 7–14–87 at 38–40. Joyce's daughter, Stephanie, testified in 1987 that she overheard Dunbar say "lie detector tests [are] nothing . . . anybody can pass them . . . as long as . . . you know how to control yourself." *Id.* at 79. Joyce's son, Lincoln, testified that he saw Dunbar pressing his mother for an alibi either the day of, or the day after, the Shaw murder. Lincoln further testified that once, when Carriger's picture appeared on television, Dunbar said, "I set him up." *Id.* at 102–04. A former friend of Dunbar's testified in 1987 that Dunbar had described destroying evidence in the Shaw case by "cut[ting] things up into small pieces." R.T. 7–15–87 at 24. Joyce's son, Dennis, averred, in a 1995 affidavit apparently given in prison, that Dunbar was not at home at the time of the murder. ER 458. Dennis also claimed that, when he (Dennis) testified at trial in 1978, he said what Dunbar told him to say. *Id.* Finally, the record includes mental-hospital, presentence, probation and police reports describing some of Dunbar's many misdeeds. ER Exs. 27–31.

no new facts that show he is "unquestionably ... innocen[t]." *Schlup,* —— U.S. at ——, 115 S.Ct. at 862.

At the same time, we acknowledge that Carriger is not unquestionably guilty. Compared to many other capital cases we have seen, the evidence of guilt here is not overwhelming. As the state court observed, Carriger "has shown ... that Dunbar is a liar, albeit a poor one." ER 170. Dunbar's recantations and other evidence of his unreliability taint more than his trial testimony, however; they also cast doubt on the reliability of much of the remaining evidence against Carriger. It was Dunbar, for example, who gave police several articles of jewelry the morning after the murder, claiming Carriger had given them to him. R.T. 7–13–78 at 35, 45. It was also Dunbar who led police to the discarded shoes and clothing Carriger had allegedly worn at the time of the murder. *Id.* at 47–49. Dunbar knew where to find these items, he testified, because he had helped Carriger dispose of them before deciding to turn him in. *Id.* at 22, 29–30. The state points to evidence that the items did belong to Carriger. R.T. 7–19–78 at 228–32; Respondents–Appellees' Answering Br. at 3. But, while blood was spattered several feet up the walls inside Shaw's jewelry store, R.T. 7–12–78 at 79–80, and the medical examiner said he would have expected to find blood on the killer's apparel, *id.* at 43, no blood was found on any of the clothes to which Dunbar led the police. R.T. 7–20–78 at 301.[12]

There is other evidence of Carriger's guilt, to be sure. Carriger acknowledged, for example, that he shaved his head the day after the murder (though he claimed he had done this several times before). R.T. 10–21–82 at 11. Significantly, Carriger's fingerprint appears on the tape found wrapped around Shaw's wrists at the murder scene. R.T. 7–20–78 at 312–16, 328–31.[13] In addition, Carriger gave an attache case containing jewelry stolen from Shaw's store to Dunbar's stepdaughter on the night of the murder. R.T. 7–17–78 at 52, 82–84; *see also* ER 447. The state points to evidence that Carriger had a key to the case when he was arrested, R.T. 7–19–78 at 241, but the case is only marginally helpful to the state because only Dunbar's fingerprints—not Carriger's—were found on the jewelry inside it. R.T. 7–12–78 at 52–53; R.T. 7–14–78 at 68.

That the evidence against Carriger is not overwhelming might well be considered by the state in deciding whether to go forward with the execution, or by the governor in exercising his power of executive clemency. See *Herrera,* 506 U.S. at 410–18, 113 S.Ct. at 866–69. The thinness of the prosecution's case, however, is an insufficient basis on which to grant relief under *Herrera* and its progeny, which put the burden on the petitioner to show he is unquestionably innocent. This Carriger has not done. Viewing all the recanting testimony (discredited as it was by the state post-conviction court), together with all of the remaining evidence presented at trial and in post-conviction proceedings, we cannot say that Carriger has managed to "unquestionably establish [his] innocence." *Schlup,* —— U.S. at ——, 115 S.Ct. at 862. His *Herrera* claim therefore fails.

---

**12.** A criminalist found droplets of either animal or human blood on the toe of the right shoe, but the amount was too small to say which it was, much less to identify it as Shaw's. R.T. 7–20–87 at 301–02.

**13.** The fingerprint's location on the tape isn't established, and Carriger maintains it was on the tape before the crime was committed. Appellant's Opening Br. at 17–18. This is consistent with Carriger's theory that Dunbar took the roll from his (Carriger's) van and used it in the murder. *Id.* at 5–6. Based on a criminalist's attempt to reconstruct the tape, the state offered to show during the 1987 post-conviction proceedings that the print was some 21 inches from an end of the nearly nine-foot-long piece used in the crime. R.T. 12–11–87 at 50–57, 63. Were

this established, it would suggest strongly that Carriger was involved in tying Shaw's hands with the tape.

Carriger argues that he has never been permitted to examine the tape and that it would therefore violate due process to consider the state's offer of proof without releasing the tape to him for expert evaluation. Appellant's Opening Br. at 15–20. In rejecting Dunbar's and his ex-wife's recanting testimony as incredible, however, the 1987 state post-conviction court did not rely on the location of Carriger's fingerprint on the tape, only on the uncontroverted fact that the fingerprint is *somewhere* on the tape. *See* ER 162; Appellant's Opening Br. at 18. In evaluating Carriger's *Herrera* claim, we do the same.

## II

■ Carriger's second claim is that the 1987 state post-conviction court erred by failing to consider Dunbar's alleged participation in Shaw's murder as a circumstance mitigating Carriger's guilt of the death penalty. We need not consider this claim on the merits because, as the district court recognized, we have held that federal habeas relief isn't available to redress alleged errors in state post-conviction proceedings. *See* Memorandum of Decision and Order at 20 (citing *Franzen v. Brinkman,* 877 F.2d 26, 26 (9th Cir.) (per curiam) (collecting cases), *cert. denied,* 493 U.S. 1012, 110 S.Ct. 574, 107 L.Ed.2d 569 (1989)). We express no view as to whether a state court has a constitutional obligation to reconsider a petitioner's death sentence during post-conviction proceedings based on newly discovered mitigating evidence.[14]

Were we to reach the merits, Carriger's claim still would fail. The aggravating circumstances leading to Carriger's death sentence were: 1) he was a previously convicted felon; 2) the murder was committed in an especially heinous, cruel or depraved manner; and 3) the murder was committed for pecuniary gain. *See State v. Carriger,* 143 Ariz. 142, 692 P.2d 991, 1009 (1984). Dunbar's participation, even if established, does not invalidate these findings. Nor does Dunbar's alleged participation show that Carriger's death sentence is "predicated on mere caprice or on factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Johnson,* 486 U.S. at 585,

108 S.Ct. at 1986 (quotation marks and citation omitted).

## III

■ Carriger's third, fourth and fifth claims allege errors at his trial, at his 1982 resentencing and at post-conviction proceedings. We affirm the district court's denial of these claims for substantially the reasons stated in the portions of the district court's Memorandum of Decision and Order set forth in the accompanying appendix. We supplement the district court's reasoning as follows:

First, we need not decide whether there would be a fundamental miscarriage of justice under *Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), were any of these claims not considered on the merits. *Schlup* entitles a petitioner to consideration on the merits of his underlying claims of constitutional error at trial, not sentencing. *See Schlup,* —— U.S. at ——, 115 S.Ct. at 861 ("[I]f a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to ... argue the merits of his underlying claims."); *id.* at ——————, 115 S.Ct. at 865–67 (distinguishing analysis used to measure actual innocence of the crime from that used to measure actual innocence of the death penalty). The district court, in fact, considered and properly rejected on the merits those parts of Carriger's third and fourth claims that asserted constitutional error at trial.[15] *See* Memorandum of Decision and Order at 23–24, 25–26;

---

**14.** We do not read *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), as requiring state post-conviction courts to consider all newly-discovered evidence relevant to aggravating factors. In *Johnson,* after a prior felony conviction was used as an aggravating factor in sentencing the defendant to death, the State Supreme Court denied a motion for post-conviction relief despite notice that the earlier conviction had been set aside. The Court held this to be an Eighth Amendment violation, given that "the reversal of the conviction deprive[d] the prosecutor[ of his] sole piece of documentary evidence" of the aggravating factor. *Id.* at 585, 108 S.Ct. at 1986. There is a big difference between evidence that negates an ag-

gravating factor as a matter of law and evidence that merely casts doubt on a factor. We read *Johnson* as limited to the former situation.

**15.** These are (1) the part of his third claim alleging that the state violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose at trial that Dunbar had been a long-time informant for the Phoenix police department's burglary detail, Petition for a Writ of Habeas Corpus ("Petition") ¶ 25.1; and (2) the part of his fourth claim asserting error based on his alleged incompetence to stand trial. *Id.* ¶¶ 26.24, 26.27.

30–33. The rest of Carriger's fourth claim,[16] and all of his fifth claim,[17] asserted error only at his 1982 resentencing; he would not have been entitled to have these assertions considered on the merits had he prevailed under *Schlup*. The rest of Carriger's third claim asserted constitutional error not at trial or resentencing but during post-conviction proceedings.[18] As noted above, we have held that federal habeas relief isn't available to redress state post-conviction errors. *See* pp. 11636–11637 *supra*.

Second, Carriger's mental illness is not "cause" for failing to raise his fourth claim in his 1985 federal habeas petition; this claim alleges that Carriger was incompetent to be tried in 1978 and resentenced in 1982. Carriger's mental illness isn't cause for failing to raise this claim in 1985, as Carriger was represented by counsel on his 1985 petition and, by then, the record in his case contained ample evidence of his alleged incompetence such that no "external impediment prevent[ed] counsel from constructing or raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991) (emphasis deleted). *See* Memorandum of Decision and Order at 27–29; Record on Appeal to the Attorney General 80, at 5–8 (Carriger's 1978 Presentence Report); Appellant's Opening Br. at 42 ¶ 20 (stating that reports of doctors who found Carriger competent to be sentenced in 1978

nevertheless "raised serious concerns about [his] mental state"); *see also id.* at 41 ¶ 19 (describing military, court and hospital records of Carriger's mental illness as "readily available").[19]

Third, we reject Carriger's argument that he is entitled to an evidentiary hearing to decide whether he was competent to be tried in 1978. We have held that such a hearing is required only where there is a "real and substantial doubt" about the petitioner's competency to stand trial. *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.1985). The test for competency is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and a rational as well as factual understanding of the proceedings against him." *Cooper v. Oklahoma*, —— U.S. ——, ——, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996) (brackets and internal quotation marks omitted).

Carriger points to the 1994 opinions of a psychiatrist and a psychologist that he was "likely" incompetent to be tried in 1978. ER 559, 581. These opinions were based principally on 1993 evaluations of Carriger and on his medical and psychiatric history. ER Ex. 32, 33. That history shows that Carriger was diagnosed several times between 1962 and 1978 as suffering from paranoid schizo-

---

**16.** This is the part of his fourth claim asserting error based on his alleged incompetence to be resentenced in 1982. Petition at ¶ 26.28.

**17.** Carriger's fifth claim asserted ineffective assistance of counsel at his resentencing. Petition at ¶ 27.

**18.** This is the part of his third claim that alleged the state violated *Brady* by failing to disclose a letter Dunbar wrote in 1987 in which he confessed murdering Shaw. Petition at ¶ 25.4. The district court considered and properly rejected this argument on the merits. *See* Memorandum of Decision and Order at 25–26. In so doing, however, the district court implicitly assumed *Brady* applies in post-conviction proceedings; we express no view on this point.

The district court also properly rejected Carriger's related motion for discovery directed at whether the state received and withheld the confession letter. As the district court explained, Carriger's *Brady* claim based on the letter would still have failed had he shown that the state

suppressed it. Dunbar's 1987 post-conviction testimony admitting that he wrote the letter rendered the actual letter immaterial for *Brady* purposes. *Id.* at 25–26.

**19.** Carriger did assert below that it would be a fundamental miscarriage of justice if his fourth claim weren't considered on the merits. The argument here was that his alleged incompetence to be tried in 1978 and to be resentenced in 1982 rendered him ineligible for, and therefore innocent of, the death penalty. ER 156. Our resolution of this claim is controlled by *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). To be entitled to consideration of this claim on the merits, Carriger had to show by clear and convincing evidence that he was incompetent to be tried or resentenced. *Id.* at 336, 348, 112 S.Ct. at 2517, 2523–24. Perhaps because Carriger recognizes that he doesn't have clear and convincing evidence of his alleged incompetence at trial or resentencing, he appears to relinquish this claim on appeal. Appellant's Opening Brief at 45 n. 23.

phrenia. Petition ¶¶ 26.4, 26.7, 26.8, 26.13, 26.14; ER Exs. 36, 37, 38, 42. In addition, he was found incompetent to be tried for various offenses in 1962, 1967 and 1969, respectively. Petition ¶¶ 26.4, 26.6–26.9, 26.11; ER Ex. 45. While the 1962 charges were dropped, Petition ¶ 26.4; ER 657, Carriger was eventually found competent to be tried and was convicted in the two latter cases, Petition ¶¶ 26.6–26.12.

No evaluation was made in 1978 of Carriger's competency to be tried for Shaw's murder. Prior to trial, however, Carriger gave his lawyer an array of materials that show beyond cavil that he understood the proceedings against him and could rationally assist in his defense. *See* Record on Appeal to the Attorney General 126, 3–21. For example:

> Petitioner ... provided counsel with a list of 73 witnesses to be subpoenaed, a page-by-page analysis of Dunbar's deposition, a detailed analysis of the physical evidence, and a closing argument to the jury.... *See also State v. Carriger,* 143 Ariz. 142, 692 P.2d 991, 996 (1984) (discussing Petitioner's "extensive participation" in the preparation of his trial and appeal).

Memorandum of Decision and Order at 30–31 (citations omitted). Moreover, based on interviews with Carriger conducted two months after trial, three doctors (including one who found him incompetent to be tried in 1967, *see* ER Ex. 39; *compare* Petition ¶ 26.8 *with id.* ¶¶ 26.19–26.20) found him competent to be sentenced. *Id.* at ¶¶ 26.19–26.20; ER Exs. 39–41. Having reviewed the record, we have not developed a real and substantial doubt about Carriger's competency to be tried in 1978.[20]

■ Finally, it's immaterial whether the district court misinterpreted Carriger's fifth claim—of ineffective assistance—as pertaining to his 1978 sentencing. Carriger argues

this part of the claim was actually directed toward his 1982 resentencing. Appellant's Opening Br. at 51 n. 26. Accepting Carriger's characterization, the claim is nevertheless abusive because it was not raised in his 1985 federal habeas petition. *See* Memorandum of Decision and Order at 34–36; *see also Bonin v. Calderon,* 77 F.3d 1155, 1159–60 (9th Cir.1996). Moreover, even if his lawyer had presented the newly discovered mitigation evidence at his 1982 resentencing, Carriger still would have been eligible for the death penalty under Arizona law. *See Sawyer,* 505 U.S. at 348–50, 112 S.Ct. at 2523–25.

The district court's judgment denying Carriger's petition is **AFFIRMED.** The stay of execution of the sentence of death entered December 1, 1995 is **VACATED.** The state's Motion for Supplemental Briefing is **DENIED** as moot.

## APPENDIX

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

Paris Hoyt Carriger, *Petitioner,*

vs.

Samuel Lewis, et al., *Respondents.*

No. CIV–95–1617–PHX–PGR.

## MEMORANDUM OF DECISION AND ORDER

ROSENBLATT, District Judge.

Petitioner, Paris Hoyt Carriger, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. He alleges that the State of Arizona convicted him of murder and sentenced him to death in violation of his constitutional rights. Petitioner filed a pre-

---

**20.** We need not reach the merits of Carriger's argument that he is entitled to an evidentiary hearing on his claim that he was incompetent to be resentenced in 1982. Carriger hasn't shown cause and prejudice for failing to raise this claim in 1985, nor has he shown there would be a fundamental miscarriage of justice were the claim not considered on the merits. *See* pp. 11639–11640 and note 19 *supra.* But we would reject the argument on the merits in any event. Carriger testified several times in connection with his 1982 resentencing and his 1982 petition for post-conviction relief. *See* R.T. 10–19–82 at 99–118; R.T. 10–20–82 at 15–45; R.T. 10–20–82 (3:10 p.m.) at 34–60; R.T. 10–21–82 at 3–62; R.T. 10–21–82 (1:45 p.m.) at 3–54, all within eight days of the court's reimposition of the death penalty. *See* R.T. 10–27–82 at 44–59. The coherence of Carriger's contemporaneous testimony shows that he was able to rationally consult with his counsel and understand the proceedings against him.

vious petition for writ of habeas corpus challenging the same conviction and sentence. *See Carriger v. Lewis,* CIV 85–1608–PHX–CAM. That petition was denied. *See Carriger v. Lewis,* 971 F.2d 329 (9th Cir.1992), *cert. denied,* 507 U.S. 992, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993).

. . . .

### Claims Raised in First Federal Habeas Corpus Petition

On July 5, 1985, Petitioner filed his first federal habeas corpus petition. (85 File doc. 1) [3] He raised the following claims:

A. The trial court limited Petitioner's counsel's cross-examination of Dunbar, the state's key witness, in violation of Petitioner's right to compulsory process and due process under the Sixth and Fourteenth Amendments.

B. Petitioner was denied effective assistance of counsel at and before trial in violation of the Sixth and Fourteenth Amendments, including counsel's failure to conduct an investigation into Dunbar's veracity.

C. Petitioner's due process rights were violated because the jury was not permitted to consider a verdict of guilty on a lesser included non-capital offense of second-degree murder.

D. The issue of whether the murder was accomplished for pecuniary gain was reconsidered in Petitioner's subsequent 1982 resentencing in violation of the Double Jeopardy Clause.

E. Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it would be ten times more likely for the murderer of a white victim to be on death row than it would be for the murderer of a non-white victim.

F. Petitioner was denied his Sixth Amendment right to have the existence of an aggravating circumstance decided by a jury.

G. Arizona's capital sentencing scheme violated Petitioner's due process rights because it did not require the trial court to find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, or that mitigating evidence was not sufficiently substantial to call for leniency beyond a reasonable doubt.

H. Petitioner was denied due process of law when the trial court instructed the jury on the elements of second-degree murder but did not provide them with a verdict form for that lesser included offense.

(85 File doc. 1)

Petitioner was denied habeas corpus relief on these claims. *See Carriger v. Lewis,* 948 F.2d 588 (9th Cir.1991); *Carriger v. Lewis,* 971 F.2d 329 (9th Cir.1992).

### Claims Raised in the Present Federal Habeas Corpus Petition

Petitioner raises the following claims in his present petition:

1. Petitioner is imprisoned in violation of his rights under the Fourteenth Amendment because no rational finder of fact could conclude beyond a reasonable doubt he murdered Robert Shaw in light of all the presently available evidence.

2. Petitioner's death sentence violates the Eighth and Fourteenth Amendments because of the Arizona courts' refusal to consider Robert Dunbar's involvement in the crime as a mitigating circumstance.

3. Petitioner's conviction and death sentence violate the Sixth, Eighth and Fourteenth Amendments because the state failed to disclose exculpatory evidence undermining the credibility of Robert Dunbar and indicating he was the actual murderer.

4. Petitioner's conviction and death sentence violate the Fourteenth Amendment

---

**3.** "85 File doc. ___" refers to documents in the Court's file opened in 1985 upon the filing of the first petition. "95 File doc. ___" refers to documents in the Court's file opened in 1995 upon the filing of the second petition. "Resp. Attach. ___" refers to the Attachments to the Answer in the 1985 file. "Pet. Ex. ___" refers to exhibits to the petition filed August 8, 1995. "R.O.A. ___" refers to documents in the file of the Arizona Superior Court. A copy of that record is provided as exhibits to the answer to the 1995 petition. "R.T." refers to reporter's transcripts.

because he was incompetent to stand trial and to be sentenced due to longstanding mental illness.

5. Petitioner's death sentence violates the Sixth, Eighth and Fourteenth Amendments because his court-appointed lawyers failed to provide him effective assistance of counsel at his 1982 resentencing.

(95 File doc. 1)

. . . .

### Third Claim.

... Petitioner alleges that Dunbar was an informant for the police department and had a history of providing false information and that the state failed to disclose these facts to the defense at the time of the trial. In addition, Petitioner alleges that the state subsequently failed to disclose a 1987 letter written by Dunbar confessing to the murder. (95 File doc. 1 at 18–22) The state court considered these claims and rejected them on the merits. (R.O.A. 400)

With respect to the informant issue, the claim is abusive because it could have been and was not presented in the first habeas petition. In 1982, in post-conviction proceedings in state court, Petitioner filed various exhibits comprised of communications by Petitioner to his trial counsel in 1978. (R.O.A. 126) In a letter to his trial counsel, Petitioner states: "Bobby Dunbar was the informant for the state against John Douglas Troutman for a safe burglery of the National Cash Register Company (sic)." (*Id.*) In another document, Petitioner refers to Dunbar's "known reputation as a snitch." (*Id.*) Furthermore, in a motion for reconsideration filed in 1984, Petitioner refers to "[t]he Department of Correction files which now reveal the wealth of *Brady* material that could have been relied upon to cross examine Robert Dunbar." (Resp.Attach. EE) The exhib-

its to that motion make various references to the fact that Dunbar was an informant.[6] Thus, the fact that Dunbar was an informant was known to Petitioner and appeared in the state court record prior to the filing of the first habeas petition in 1985. It also was known, or easily could have been ascertained, that the state had not disclosed such information (assuming the state had such information). Petitioner has not shown cause for failing to raise this claim earlier.

The claim that the state failed to disclose Dunbar's history of providing false information is also an abuse of the writ because the claim was identified prior to the filing of the first habeas petition. In 1981, Petitioner filed a petition for post-conviction relief in state court which alleged:

[D]efense counsel [failed] to seek and obtain *Brady* material from the state which would tend to impeach the credibility of Robert Dunbar. This material would include, but not necessarily be limited to, the state prison file of Dunbar and other materials showing the bad reputation for truth and dishonesty of Dunbar and further, the character trait of blaming others for his own misdeeds.

(R.O.A. 108) In September 1982, Petitioner filed a Motion for Disclosure requesting Dunbar's Department of Corrections file. (R.O.A. 138) Petitioner's Memorandum on Post–Conviction Relief, filed October 27, 1982, describes the evidence of Dunbar's history of lying to the police which was contained in the Department of Corrections records and which Petitioner now claims the state failed to disclose at trial. (R.O.A. 175)[7] Thus, the evidence in question appears in the state court record prior to 1985. It also was known that the state had not disclosed this evidence (assuming the state had such evidence). Petitioner has not shown cause for

6. *See* the Motion for Reconsideration (Resp.Attach. EE), filed by Petitioner in the Arizona Supreme Court on December 26, 1984, Exhibit A (pp. 3, 73) which is a 1982 interview of Dunbar by Petitioner's counsel, and Exhibit D, Presentence Report re *State v. Dunbar* (p. 12). *See also* R.O.A. 185 (p. 26) which is Petitioner's Memorandum on Resentencing filed November 2, 1982, which states: "As an individual who was a

friend of Dunbar's, Carriger nonetheless knew of Dunbar's history of 'snitching' and lying."

7. *See also* Petitioner's Memorandum on Resentencing, filed November 2, 1982, discussing Dunbar's Department of Corrections file and a defendant's right to obtain favorable evidence pursuant to *Brady*. (R.O.A. 185 at 15)

failing to raise this issue in the first habeas petition.

Furthermore, there is no prejudice. Dunbar's possible bias and motive was brought out at trial, as well as evidence that he was a liar. Dunbar admitted during direct examination that he had six prior felony convictions for burglary and was currently on probation for his last conviction. (R.T. 7/13/78 at 11) He testified that he had committed another burglary just three days before the date of the murder. (*Id.*) He also explained that he was motivated to testify against Petitioner because in exchange for his testimony he had been granted immunity for the burglary and for purchasing a gun (a parole violation). (*Id.* at 44, 53) Dunbar admitted that on the day of the murder he had purchased a gun for Petitioner and lied on the registration form about being a convicted felon and gave an incorrect address. (*Id.* at 8) He also said that if Petitioner had committed only a robbery, and not a murder, Dunbar would not have turned him in. (*Id.* at 54) During cross-examination, Petitioner's counsel questioned Dunbar extensively about various subjects and repeatedly impeached him with prior inconsistent statements. (R.T. 7/14/78 at 16–71) In addition, Dunbar admitted that he quit a job because he was accused of stealing money, and he quit another job after money was missing. (*Id.* at 8–11) He had been discharged from the Army after six months with less than an honorable discharge. (*Id.* at 11) Dunbar admitted that he was broke and in debt and had filed bankruptcy that year. (*Id.* at 58) It was even established that he had struck his step-daughter. (*Id.* at 36) Petitioner's counsel also aggressively pursued a line of questioning attempting to show that it was Dunbar, not Petitioner, who committed the robbery and murder. (*Id.* at 68–71)

Dunbar's Department of Corrections file does contain documents relating how on several occasions Dunbar committed burglaries and then lied to police, in one case blaming the crime on another person. However, the documents also show that Dunbar confessed when the police questioned his incredible stories. This evidence does not tend to show that Dunbar could create an elaborate story to frame Petitioner and maintain it under questioning by the police, prosecution attorneys, and defense counsel.

Thus, the evidence of Dunbar's informant status and history of lying to the authorities would have added very little to the wealth of negative information about Dunbar's veracity which was presented to the jury. It is highly improbable that the verdict would have been different because of it. Therefore, prejudice cannot be established.

Regarding the 1987 confession letter, Dunbar wrote the letter to Susan Stewart, a church member participating in a jail ministry program. (Pet.Ex. C) In her affidavit, Ms. Stewart states that Dunbar confessed to a murder, but she cannot remember the details described in the letter. (*Id.*) She says that a woman with the prosecutor's office asked her to mail them the letter and that she did so. (*Id.*) At the post-conviction relief hearing on October 30, 1987, Dunbar testified about how he had committed the robbery and murder of Mr. Shaw. (Pet.Ex. E) Dunbar also testified that he made the same confession in a letter he had sent to Ms. Stewart. (*Id.* at 72) At the hearing on December 11, 1987, Dunbar recanted his confession. (Pet.Ex. F) He also testified that his statements in the letter were lies. (*Id.* at 127)

Petitioner's claim is based on the state's failure to disclose the letter prior to the hearing. Because this claim could not have been raised before 1987, there is cause for Petitioner's failure to include the claim in the first habeas petition. However, Petitioner cannot show prejudice. The letter would be merely cumulative of Dunbar's confession and testimony at the October 30, 1987 hearing. It is therefore insignificant. In addition, Dunbar retracted his confession and the letter a few weeks later. Moreover, Dunbar's "confession" was not credible. *See* discussion *supra*, at 762–63. The result of the hearing would not have changed if the letter had been available.

. . . .

Alternatively, Petitioner has not met the requirements of a claim based on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A successful *Brady*

claim requires three findings: 1) the prosecution suppressed the evidence; 2) the evidence was favorable to the accused; and 3) the evidence was material to the issue of guilt or punishment. *Id.* Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. *Id. See also Harris v. Vasquez,* 949 F.2d 1497, 1528 (9th Cir.1990). Petitioner has not shown that the state suppressed Dunbar's Department of Corrections file. In addition, as discussed above, it is very unlikely that the outcome of Petitioner's trial would have been different if the additional impeachment evidence had been presented to the jury. *See e.g., Griffin v. Delo,* 33 F.3d 895, 904 (8th Cir.1994) (undisclosed evidence of principal witness' arrest for assault and impersonation of officer was not "material" where petitioner's cross-examination of witness revealed other criminal history and misconduct). In addition, Petitioner has not shown that the state actually received the letter and withheld it. The state has no record of having requested or having received the letter. (R.O.A. 363) The state court found that the state did not withhold the letter. (R.O.A. 400) Moreover, for the reasons stated above, the letter was not "material."

### Fourth Claim.

... Petitioner states that prior to the 1978 trial which resulted in his conviction and death sentence, he had a lengthy documented history of severe mental illness and incompetency. Petitioner further states that despite this history, his trial counsel made no motion to determine his competency to stand trial, nor did the trial court *sua sponte* order such an evaluation. A psychiatric evaluation was done two months later prior to sentencing and he was determined to be competent for that proceeding. For his 1982 resentencing proceeding a competency determination was not made. Now, seventeen years after his trial, Petitioner argues that his constitutional rights were violated because the trial court

failed to order a psychiatric examination to determine whether Petitioner was competent to stand trial in 1978 and to be resentenced in 1982. Petitioner also claims that his counsel for trial rendered ineffective assistance in failing to investigate Petitioner's psychiatric history and present appropriate legal argument based on it. (95 File doc. 1 at 23–31) [8]

The state court ruled that these claims were precluded because they should have been raised previously. (R.O.A. 400) Thus, the claims are procedurally defaulted. The claims are also an abuse of the writ because they could have been and were not presented in Petitioner's first federal habeas petition in 1985. The Court cannot decide the merits of the claims because Petitioner has utterly failed to show cause and prejudice.

The record shows that prior to Petitioner's sentencing in 1978, his counsel moved the trial court to order an examination to determine whether Petitioner was competent to be sentenced. (R.O.A. 73) The motion was based on "the fact that the defendant has been treated on two separate occasions at the Arizona State Hospital" and on "personal observations by the defendant's counsel." (*Id.*) The trial court appointed three psychiatrists to examine petitioner. (R.O.A. 75) On September 22, 1978, Dr. Otto Bendheim evaluated Petitioner's competency to be sentenced. His report states, in part:

> Background information was provided by Thurman Gay, Esq., defense counsel. Unfortunately I was unable to obtain the records of the Arizona State Hospital. However, I had access to my own records of July 10, 1967 when I examined this man for the Superior Court....
>
> The defendant is able to understand the proceedings against him. He is competent to be sentenced at this time. He has a full understanding, both factual as well as fairly rational, of the concept of waiver of rights, the concept of entering a plea of guilty and its possible consequences.
>
> However, it should be mentioned that this man has been suffering from a long stand-

---

**8.** Petitioner did not raise these claims on direct appeal, in his first and second petitions for post-conviction relief in state court, or in his first federal habeas petition. Petitioner also claims

that his counsel for resentencing in 1982 was ineffective for failing to request a competency examination. That claim is addressed in the discussion of the Fifth Claim, *infra.*

ing psychotic process, schizophrenia, mainly paranoid, which is at present not particularly active, and does not prevent him from participating in court proceedings. (Pet. Ex. N; R.O.A. 83) The other two psychiatrists also concluded that Petitioner was competent to be sentenced. (R.O.A. 81, 82) Dr. Tuchler described Petitioner as "a man of good intelligence, quite aware of the complexity of legal defenses which he considers himself an expert in," and who describes himself as a "jailhouse lawyer" who has prepared writs for other inmates. (R.O.A. 82) The doctors' reports also noted that as a teenager Petitioner was committed to the Fort Grant Juvenile Institution as "incorrigible." In 1960 he enlisted in the Air Force, but was honorably discharged after fifteen months for medical reasons (which he would not explain). He was at the Arizona State Hospital for several months in 1968 and 1969. (R.O.A. 81, 82)

Also in the record is the pre-sentence report. (R.O.A. 80) Petitioner stated to the officer preparing the pre-sentence report that in the Air Force he was required to undergo psychological and psychiatric tests after he hit his commanding officer with a trenching tool. The report also states that in 1964 Petitioner was sentenced to three to five years for second degree burglary. He was released on parole on March 1, 1966, and arrested on March 9, 1966 on a charge of grand theft from person. The charge was reduced to joyriding and Petitioner was returned to prison as a parole violator. Shortly after his release in 1967, Petitioner was arrested on charges of car theft, assault, and attempted murder. In that case Petitioner received a ten to twelve year sentence for grand theft and a nine to ten year sentence for aggravated battery with a prior conviction. A psychiatric report from the Arizona State Hospital dated November 13, 1967, stated that Petitioner was a sociopath personality, antisocial type, with extreme anger and hostility, who would try to manipulate any individual he came in contact with. (R.O.A. 80) The psychiatrist also found that Petitioner was without mental disorder and was able to assist counsel. In 1976, prior to a parole board hearing, Petitioner was diagnosed as having a paranoid personality disorder with antisocial feelings.[9] Petitioner ultimately was given an absolute discharge from the Department of Corrections in 1978. (Id.)

Thus, the facts upon which Petitioner now bases his incompetency claim (and ineffective-assistance-of-counsel claim) existed and even appeared in the record prior to 1985. A "petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." McCleskey, 499 U.S. at 498, 111 S.Ct. at 1472. Petitioner has not demonstrated cause to excuse the abuse of the writ or the procedural default.

In addition, Petitioner has not shown prejudice. Three psychiatrists determined that Petitioner was competent for the sentencing proceeding, which was only two months after the trial. There is also substantial contemporaneous evidence that prior to and during trial Petitioner understood the proceedings and assisted his counsel. Prior to trial, Petitioner wrote a letter to his counsel directing him to obtain affidavits from certain witnesses and to obtain Dunbar's and Petitioner's prison records, directing him to allege conflict of interest of a prosecuting attorney, providing counsel with information about Dunbar, and giving him fact-specific questions to use in Ms. Stevens' deposition. (R.O.A. 126) Petitioner also gave counsel examples of his good character, including the fact that for years he defended inmates in prison disciplinary court and was "active in the legal aspects of years of litigation attempting to change the prison system in the courts." (Id.) Petitioner told his counsel: "In fighting this case I want every little thing from every witness possible brought in. The sheer weight of numbers can sometimes do what the evidence can't and the more there is the better chance of reversable (sic) er-

9. Under Arizona law, a person cannot be tried for an offense while, "as a result of a mental illness or defect," the person is unable to understand the proceedings or to assist in his own defense. Ariz.R.Crim.Proc. 11. A person can be found legally insane at the time of the offense if he had a "mental disease or defect." A.R.S. § 13–502. "Mental disease or defect" does not include personality disorders or character defects. Id.

ror...." (*Id.*) Petitioner also provided counsel with a list of 73 witnesses to be subpoenaed, a page-by-page analysis of Dunbar's deposition, a detailed analysis of the physical evidence, and a closing argument to the jury. (*Id.*) *See also State v. Carriger,* 143 Ariz. 142, 692 P.2d 991, 996 (1984) (discussing Petitioner's "extensive participation" in the preparation of his trial and appeal).

Petitioner simply has no evidence that he was incompetent to stand trial in 1978 or to be resentenced in 1982. The new expert opinions submitted by Petitioner are speculative at best. The opinions were rendered in 1994, sixteen years after the trial. A psychiatrist and psychologist conclude that it was "likely" that Petitioner was incompetent in light of his psychiatric history. (Pet. Ex. G at 20, 23; Pet. Ex. H at 20, 21) In his 1994 affidavit, Dr. Bendheim states that Petitioner "might" have been incompetent to stand trial because an individual's psychiatric condition can change, but he affirms his original 1978 diagnosis that Petitioner was competent for sentencing. (Pet. Ex. I at 7, 8) The new opinions are not persuasive. *See Harris v. Vasquez,* 949 F.2d 1497, 1515 (9th Cir.1990) (rejecting a claim based on new psychiatric opinions and noting that "psychiatrists disagree widely and frequently on what constitutes mental illness" and that a defendant could, if allowed, always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion).

. . . .

Alternatively, the Court finds that Petitioner's due process rights were not violated. Due process requires the state court to conduct a competency hearing on its own motion whenever a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence. *United States v. Lewis,* 991 F.2d 524, 527 (9th Cir.1993). The issue before this Court is not whether Petitioner was in fact incompetent to stand trial in 1978, but whether the trial judge had evidence before her which should reasonably have caused her to doubt Petitioner's competence. *See Id.* "A good faith doubt about a defendant's competence arises if there is substantial evidence of incompetence." *Id.*

The new expert opinions rendered in 1994 were obviously not before the trial judge in 1978 (trial) or 1982 (resentencing). Therefore, they are not relevant to Petitioner's due process claim. *See Lewis,* 991 F.2d at 527 (rejecting as irrelevant a 1991 psychological evaluation offered as evidence of 1982 incompetence). Petitioner also points to his history of mental illness as documented in military records and a prior state court case, but he fails to allege that this material was presented to the trial judge. This Court's review of the record indicates that it was not. There was nothing before or during trial which should have caused the trial judge to doubt Petitioner's competency to stand trial. Petitioner further relies on the pre-sentence report which the judge reviewed a couple months after trial. However, even considering the report, there was no "substantial evidence of incompetence" before the judge. The report related that in 1967 Petitioner had been diagnosed as a sociopath personality who was *without mental disorder and was competent to be tried* for aggravated battery. In addition, the judge had the opinions of three psychiatrists that Petitioner was competent to be sentenced (only two months after trial). Similarly, the trial judge did not have before her sufficient evidence to create a bona fide doubt as to Petitioner's competency for the 1982 resentencing proceeding.

In addition, and alternatively, the Court finds that Petitioner has failed to show that trial counsel's performance in not requesting a competency hearing was constitutionally deficient. Petitioner has also failed to show that there was a reasonable probability that he would have been found incompetent. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### Fifth Claim.

Petitioner's fifth and last claim is an ineffective-assistance-of-counsel claim in which Petitioner alleges that his counsel for the 1982 resentencing hearing failed to adequately investigate and present records and witnesses pertaining to Petitioner's family, social, medical, institutional, military and psychiatric history. Petitioner further alleg-

es that his counsel failed to consult with and present the testimony of any mental health experts, and failed to investigate whether he was competent to be sentenced. In addition, he claims that counsel should have objected and moved to recuse the trial judge based on an *ex parte* communication between the court and the state prior to Petitioner's sentencing hearing. He also claims that counsel should have challenged the evidence of a prior conviction submitted as an aggravating circumstance. (95 File doc. 1 at 31–38)

In a post-conviction relief proceeding, the state court held that these claims were precluded because they should have been raised in the earlier post-conviction proceeding. (R.O.A. 400) Thus, the claims are procedurally defaulted.

In his present federal habeas petition, Petitioner does not dispute that his ineffective-assistance-of-counsel claim is new. Rather, he argues that the claim "was not raised in the earlier petition for habeas corpus relief filed [in 1985] because the same counsel who represented him at his 1982[re]sentencing proceedings represented him in the earlier federal habeas corpus proceedings." (95 File doc. 1 at 40)

. . . .

Because this claim was not raised in the first federal habeas petition, it is an abuse of the writ. Petitioner argues that there was "cause" because his counsel for resentencing was the same counsel who handled his first habeas petition. The Court disagrees.

Petitioner is really claiming that his first habeas counsel was ineffective for failing to raise (in the habeas petition) the issue of his own ineffectiveness at the resentencing stage. However, ineffective assistance of counsel can represent sufficient cause only when it rises to the level of an independent constitutional violation. *Coleman v. Thompson*, 501 U.S. 722, 755, 111 S.Ct. 2546, 2567–68, 115 L.Ed.2d 640 (1991). By definition, such a violation could not have occurred here because there is no Sixth Amendment right to counsel in federal habeas proceedings. *Harris v. Vasquez*, 949 F.2d 1497, 1513–14 (9th Cir.1990), *cert. denied*, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987). In *Bonin v. Vasquez*, 999 F.2d 425, 429 (9th Cir.1993), the Ninth Circuit held that a defendant has no Sixth Amendment right to counsel during his state habeas proceedings even if that was the first forum in which he could challenge constitutional effectiveness of trial counsel. The *Bonin* decision reasoned that granting a defendant the constitutional right to counsel at his "first possible" post-conviction proceeding would necessarily grant him that same right in all subsequent post-conviction proceedings. *Id.* at 429. The practical result would be "an infinite continuum of litigation" and the exception would swallow the rule. *Id.* The same reasoning applies in the present case. If allowed, a petitioner could keep the same counsel until all avenues for relief were exhausted and then file a new petition alleging that his former counsel was ineffective at every stage. There would be no end to the litigation. The Ninth Circuit has rejected the "same counsel as cause" argument in a recent decision, applying the principles and reasoning of *Coleman* and *Bonin*. *See Jeffers v. Lewis*, 68 F.3d 299 (9th Cir.1995) (plurality opinion). Therefore, the failure of Petitioner's first habeas counsel to assert the ineffectiveness claim cannot constitute cause sufficient to overcome the abusive nature of his subsequent petition.

Furthermore, prior to the time of filing his 1985 habeas petition, Petitioner was knowledgeable of the facts necessary to a challenge to his counsel's effectiveness. Petitioner observed his counsel's performance at the 1982 resentencing hearing. He knew what records and witnesses his counsel did present and did not present pertaining to Petitioner's family, social, medical, institutional, military and psychiatric history. He knew that his counsel did not present the testimony of mental health experts. He certainly was aware of his own background, relevant biographical data and psychiatric history. (Those facts would be peculiarly within Petitioner's own knowledge.) Abuse-of-the-writ doctrine examines the petitioner's conduct: The question is whether the petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege the claim

in the first petition. *McCleskey*, 499 U.S. at 498, 111 S.Ct. at 1472. Because as early as 1982 Petitioner knew of the circumstances which he now alleges is incompetence of counsel, he cannot establish cause under *McCleskey* for failure to raise that claim in his 1985 petition. *See Id.*, 499 U.S. at 498–99, 111 S.Ct. at 1472–73. *See also Jeffers v. Lewis*, 68 F.3d 299 (9th Cir.1995).

It is also clear from the record that Petitioner knew he had the option to make an ineffective-assistance-of-counsel claim and request that new counsel be appointed. After his trial, he did exactly that. On August 30, 1978, Petitioner filed on his own behalf in state court a handwritten "Motion to Appoint New Council for Appeal Because of a Conflict of Interest Between Present Council and Raising the Issue of Incompetant Legal Council (sic)," in which he stated: "I, the petitioner, Paris Hoyt Carriger Hereby submit formal notice of my intent to raise the issue of incompetant Legal Council. this fact creates a definate conflict of interest in the situation of being represented beyond this point by my present attorney (sic)." (R.O.A. 72) In his motion, Petitioner alleged that his trial counsel was ineffective because he failed to investigate six witnesses, failed to call a witness who would establish Petitioner's probable innocence, and in closing argument improperly referred to exculpatory evidence which was never put before the jury during trial. In October 1978, Petitioner filed various motions on his own behalf including another "Motion to Appoint New Legal Council to Appeal (sic)" and "Motion to dismiss Court Appointed Council on the grounds of Incompetance (sic)." (R.O.A. 85). Thus, it is reasonable to assume that in 1982 Petitioner knew that an ineffective-assistance-of-counsel claim was legally possible and that he had the means to pursue it.[10] Nevertheless, Petitioner made no effort to replace his counsel after the 1982 resentencing proceeding, or proceed pro se and raise an ineffectiveness issue. Such a strategic choice constitutes a deliberate withholding of a claim, and subsequent assertion of that claim is abuse of the writ. *See Booker v. Wainwright*, 764 F.2d 1371 (11th Cir.1985) (finding abuse of writ for failure to bring ineffective-assistance-of-counsel claim in first habeas petition was not excused even though trial/sentencing counsel was also habeas counsel);[11] *In re Shriner*, 735 F.2d 1236 (11th Cir.1984) (finding no cause for abuse of writ on ineffective-assistance-of-counsel claim even though habeas counsel was also trial counsel).

Because cause has not been established, the Court need not address the issue of prejudice....

Alternatively, the Court finds that Petitioner has failed to show that resentencing counsel's performance in not requesting a competency hearing was constitutionally deficient. Petitioner has also failed to show that there was a reasonable probability that he would have been found incompetent. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### *CONCLUSION*

For the above-stated reasons, the Court ... concludes that the Third, Fourth, and Fifth Claims are an abuse of the writ and that Petitioner has failed to show cause and prejudice to overcome the procedural bar. Alternatively, the claims have no merit.

....

Accordingly,

---

10. In his second petition for post-conviction relief, Petitioner specifically requested that his resentencing counsel be appointed to represent him. (R.O.A. 204) He also acknowledged that he understood "that no further petitions concerning this conviction may be filed on any ground of which I am aware but do not raise at this time," (*Id.*).

11. In the *Booker* case, the petitioner claimed his counsel, who was his counsel for trial, sentencing, and the first federal habeas petition, was ineffective in failing to thoroughly investigate and present evidence of the petitioner's unhappy family background, limited education, military service and psychiatric hospitalizations over the years preceding the murder, in failing to obtain all of the hospital records pertaining to his psychiatric treatment, and in failing to have the petitioner examined by a neurologist.

IT IS ORDERED denying with prejudice Petitioner's Petition for Writ of Habeas Corpus filed on August 8, 1995 [file doc. no. 1].

. . . .

DATED this 1st day of November, 1995.